2007 WY 176

**Allan Deon WEASE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 06–187.

Supreme Court of Wyoming.

Nov. 5, 2007.

Representing Appellant: D. Terry Rogers, Acting Wyoming Public Defender; Donna D. Domonkos and Tina N. Kerin, Appellate Counsel, Wyoming Public Defender; Diane E. Courselle, Director, Defender Aid Program; Thomas Justice, Student Intern; and William Elliott, Student Intern. Argument by Ms. Courselle.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Leda M. Pojman, Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] The Appellant, Allan Deon Wease (Wease), seeks review of his twelve convictions for various sex crimes, including second degree sexual assault, third degree sexual assault, and immoral or indecent acts with a child. Wease contends that with respect to Count V of his convictions, he was sentenced under a statute that did not take effect until after the crime was committed. The State concedes this error and agrees that the case

must be remanded to the district court for resentencing on that matter.

[¶ 2] With respect to Count VII, Wease contends that the State failed to prove the temporal element of that crime (that the crime occurred within the time limits specified in the instructions given to the jury by the district court, based on the third amended Information). At trial, the State conceded that it had failed to prove that element of the crime and told the jury it should acquit. However, the jury convicted anyway. On appeal, the State propounds an argument that the evidence of the temporal element of the crime was adequate. We do not agree with that argument, and we will reverse that conviction and direct that Count VII be dismissed on remand.

[¶ 3] Wease also contends that the State overwhelmed the jury with literally hundreds of instances of prior bad acts in violation of W.R.E. 404(b) and our jurisprudence with respect to that rule. We will conclude that this contention does not require the reversal of Wease's other eleven convictions.

[¶ 4] Finally, Wease contends that his defense attorney was ineffective because he failed to develop any sort of strategy to limit the wholesale admission of W.R.E. 404(b) evidence. We will conclude that defense counsel's performance was adequate and did not prejudice Wease's case.

[¶ 5] We will reverse in part, affirm in part, and remand to the district court for further proceedings consistent with this opinion.

## ISSUES

[¶ 6] Wease articulates these issues:

I. Did the district court impose an illegal sentence when it sentenced Mr. Wease in accordance with the post-amendment sexual assault statute despite the fact that the State established the criminal offense occurred before the statute was amended in 1997?

II. Was the evidence convicting Mr. Wease of the criminal act charged in Count VII insufficient because the State failed to establish that the criminal offense occurred within the time period charged in the third amended information?

III. Did plain error occur when the State overwhelmed the jury with substantial uncharged misconduct evidence which was unduly prejudicial or beyond the scope of the parties' 404(b) stipulation and the trial court failed to take adequate measures to limit the problems with its reckless approach to its evidentiary presentation?

IV. Did trial counsel's failure to develop any meaningful strategy to address the uncharged misconduct and notice issues amount to ineffective assistance of counsel because it led to the virtually unrestricted admission of so much uncharged misconduct that the jury's determination of the issues had to be adversely affected?

The State rephrases the issues somewhat:

I. [Wease's] sentence on Count V exceeded the statutory limits in effect at the time of the offense; thus, [his] sentence on that Count is illegal.

II. Was there sufficient evidence to find [Wease] guilty of Count [VII]?

III. Did the district court err in admitting stipulated uncharged misconduct evidence and was [Wease] prejudiced by the same? Moreover, did the State unnecessarily complicate the presentation of evidence and fail to give proper notice of the sexual intrusion charged in Count III?

IV. Was [Wease's] trial counsel ineffective?

In his reply brief, Wease asserts that the State raised these new issues:

I. In response to Mr. Wease's claim that the evidence was legally insufficient to support conviction on Count VII, the State makes the new argument that the testimony regarding when the alleged offense occurred was only a few months, rather than over one year, from the time period charged.

II. The State makes the new argument that, because Mr. Wease entered a stipulation regarding what evidence could be introduced pursuant to W.R.E. 404(b), he cannot object to any of the W.R.E. 404(b) evidence, because the stipulation makes any error "invited."

III. The State makes the new argument that because Mr. Wease did not file a request for notice of the State's intent to introduce W.R.E. 404(b) evidence, he has waived any objection to the State's introduction of other bad acts evidence which may have departed from the reasonably anticipated scope of the stipulation?

## FACTS AND PROCEEDINGS

[¶ 7] The first Information was filed in this case in the district court on July 14, 2005. It alleged twelve distinct crimes that occurred between the years 1994 and 2005. The Information was amended many times. The Information which enumerated the crimes considered by the jury at trial was filed of record on February 8, 2006 (the trial began on February 6, 2006). It also alleged twelve distinct crimes that occurred between 1993 and 2005, and it is those twelve counts that we will describe in more detail later in our discussion. The trial in this case took place from February 6, 2006, through February 9, 2006, so it is readily evident that the elements of the crimes (especially as to dates) did not become solidified until much of the testimony was in.

[¶ 8] The record also reflects that the State filed a Notice of Intent to Use Evidence Pursuant to W.R.E. 404(b) on October 28, 2005. At a hearing held on November 2, 2005, the defense asked for additional time to respond to that notice, and the district court indicated that it would be taken up at a future date. The matter was again broached at a motion hearing held on January 17, 2006. Eventually, the parties reached a general sort of agreement/stipulation and established a so-called "road map" to the 404(b) evidence that the State intended to introduce. In many ways, that road map mirrored the affidavit of the investigating police officers, which summarized the statements given by each of the victims.

[¶ 9] The matters that became the subject of this criminal prosecution first came to light when Wease made salacious overtures to a co-worker in October of 2004. The co-worker complained of a headache, and Wease suggested a cure for that would be for Wease to rub the co-worker's genitals. The co-worker declined that offer. Wease also asked the co-worker to pose nude for him, but that offer was also declined. The co-worker reported this conduct to his supervisor (because he felt he was "violated"). The co-worker also told Charles Brown about it on May 18, 2005. The co-worker said that Brown became very angry about it. The co-worker admitted in cross-examination that he knew that Brown had a father/son-like relationship with two of Wease's potential victims (although they had not yet been identified as victims), and that Brown would get angry when he was told about Wease's behavior (because Wease also had considerable contact with those children). On the night of May 18–19, 2005, Wease was stabbed and Wease believed it was Brown who did it. At the conclusion of this testimony, the district court gave this limiting instruction with defense counsel's acquiescence:

> You are instructed that the testimony of the last witness was provided solely to put into context the testimony of the next witness to show why the next witness reported to the police. You're not to consider the evidence as a showing of character of the Defendant or that he acted in conformity with that character trait.

[¶ 10] Charles Brown testified that Wease was a neighbor of his in Mountain View and that in May of 2005 he had a discussion about Wease with the witness described immediately above. The behavior of Wease described above was not repeated, but Brown related that its content "made me sick to my stomach." Brown went on to describe his close relationship with two boys, JS and BG, who were the children of a former girlfriend. Brown reached BG by phone and asked him if "anything had happened" between him and Wease. After a few moments of pausing, BG said, "Yes." Brown then set out to find Wease, but another friend talked him into going to the police instead. Brown happened upon a police officer in Lyman and reported what BG had told him. Although Brown was still in a fury, he eventually went home and did not go out again that night. On cross-examination, Brown admitted he knew that JS and BG had been investigated

for child sexual abuse incidents perpetrated by them on other children.

[¶ 11] Sheriff's Deputy Jensen Odde undertook an investigation of BG's allegations of sexual assault against Wease on May 19, 2005. On that same date, Odde was called to the scene of an incident where it was reported that Wease had fallen on a knife. Odde was very skeptical that that could have occurred, based on his examination of the crime scene, and he also observed that Wease had cuts on his wrists that may have connoted a suicide attempt. Odde also found an empty pill bottle that augmented the suicide angle, and so he looked for a suicide note at the scene. Some writing was found on a bathroom wall to this effect: "I can't take the lies any more, you bastards. Meet you in hell. Cass." It appeared that Wease had written that note (suicide note?). A black Sharpie marker was found near the note that was written on the wall. Two empty pill bottles that had contained Lexapro were also found in the bathroom (Wease was taking Lexapro). It appeared that Wease had vomited on the floor in that area of his residence (but that material was not examined forensically to tie it to the Lexapro).

[¶ 12] Lyman Police Officer Aaron Roberts testified about the investigation he conducted at Wease's home on May 19, 2005. He ascertained that one of Wease's sons had called for an ambulance because he thought his father had had a heart attack and had fallen on the knife when he had the heart attack. Wease stated that he had passed out and fallen on the knife. Roberts' investigation of the scene led him to believe that Wease had attempted suicide.

[¶ 13] All of the information set out above was viewed by the parties as background information that explained why the subsequent investigation into Wease's sexual abuse of children was initiated. In other words, it served to introduce the first part of the larger "story," which was then followed by the testimony of victims of Wease's abuse and how he lured them into those activities.

**The Victims—[BG]**

[¶ 14] BG was the first victim to testify (dob June 26, 1990). Counts III and IV of the twelve counts involved BG. We set them out below as they appeared in the instructions to the jury:

### JURY INSTRUCTION NO. 19

The elements of the crime of Sexual Assault in the Third Degree, as charged in **Count III** of this case are:

1. Between January 1, 1999 and June 26, 2001

2. In Uinta County, Wyoming

3. The Defendant, Allan Deon Wease

4. Inflicted sexual intrusion upon [BG]

5. The Defendant was at least four years older than [BG]; and

6. [BG] was under the age of sixteen years.

During the time frame alleged in the instruction, Wyo. Stat. Ann. § 6–2–304 (LexisNexis 2001) provided:

**§ 6–2–304. Sexual assault in the third degree.**

**(a) An actor commits sexual assault in the third degree if, under circumstances not constituting sexual assault in the first or second degree:**

**(i) The actor is at least four (4) years older than the victim and inflicts sexual intrusion on a victim under the age of (16) years; or**

(ii) The actor is an adult and subjects a victim under the age of fourteen (14) years to sexual contact without inflicting sexual intrusion on the victim and without causing serious bodily injury to the victim;

(iii) The actor subjects a victim to sexual contact under any of the circumstances of W.S. 6–2–302(a)(i) through (iv) or 6–2–303(a)(i) through (vi) without inflicting sexual intrusion on the victim and without causing serious bodily injury to the victim. [Emphasis added.]

"Sexual intrusion" was defined by Wyo. Stat. Ann. § 6–2–301(a)(vii) (LexisNexis 2001) as:

(vii) "Sexual intrusion" means:

(A) Any intrusion, however slight, by any object or any part of a person's body, except the mouth, tongue or penis, into the genital or anal opening of another person's

body if that sexual intrusion can reasonably be construed as being for the purposes of sexual arousal, gratification or abuse; or

(B) Sexual intercourse, cunnilingus, fellatio, analingus or anal intercourse with or without emission.

### JURY INSTRUCTION No. 20

The elements of the crime of Taking Indecent Liberties with a Child, as charged in **Count IV** of this case are:

1. Between January 1, 1999 and June 2, 2001

2. In Uinta County, Wyoming

3. The Defendant, Allan Deon Wease

4. Knowingly took indecent liberties with [BG], a child.

At the time the crime was alleged to have been committed, Wyo. Stat. Ann. § 14–3–105 (LexisNexis 2001) provided:

**§ 14–3–105. Immoral or Indecent acts; penalty.[1]**

(a) Except under circumstances constituting sexual assault in the first, second or third degree as defined by W.S. 6–2–302 through 6–2–304, any person knowingly taking immodest, immoral or indecent liberties with any child or knowingly causing or encouraging any child to cause or encourage another child to commit with him any immoral or indecent act is guilty of a felony.

[¶ 15] With respect to Count IV, the jury was also instructed:

### JURY INSTRUCTION NO. 21(a)

You are instructed that in **Count IV** the State offers two alternative theories on which it asks you to convict the defendant of Indecent Liberties With a Child. The first theory the State propounds is that the defendant provided pornographic magazines to [BG] and promoted [BG's] viewing of those photographic images. The second theory the State propounds is that the defendant manually manipulated [BG's] penis after making [BG] disrobe in his presence.

Because you are being asked to consider these alternative theories propounded by the State, it is a requirement of the law that to convict the defendant you must agree unanimously on the basis for a conviction. A conviction cannot be returned based on some jurors being convinced beyond a reasonable doubt that one theory has been proven, and all the rest of the jurors believing another theory has been proven beyond a reasonable doubt.

Therefore, as to your verdict on **Count IV,** if you decide unanimously that one theory, or the other, or all have been proven beyond a reasonable doubt, you should mark the line for the appropriate theory on Count IV.[304]

[¶ 16] In his testimony, BG related that his best friend was Wease's son, JW, and that he frequently visited Wease's home to play with JW. In 2000 or 2001, BG recalled an incident that took place in Wease's garage. Wease asked BG to go to the garage with him where he showed BG a magazine with pictures of naked men and women. Wease also rubbed his hand over BG's clothed penis. BG resisted and tried to leave, but Wease pulled down his pants and underwear and tried to get BG to rub his penis or to suck his penis. BG still resisted and proceeded to leave the garage. Wease told BG he should not tell or they would both get into trouble.

[¶ 17] A week or two after that, BG was playing with JW at the Wease home and Wease asked them both to come into his bedroom. Wease locked the bedroom door from the inside (with a slide type lock). He showed them a collection of pornographic magazines (naked men, naked men and women together, etc.). The boys wanted to look at the magazines, but Wease said there was something they had to do first: "... you have to let me touch you and you have to touch me." At first Wease touched the boys' penises while they were clothed, but eventually it led to Wease performing fellatio on

1. This statute was repealed in 2007 and is now included within Wyo. Stat. Ann. §§ 6–2–314 through 6–2–319 (LexisNexis 2007).

BG, while JW did the same thing to Wease. This activity continued for about forty-five minutes, until Wease ejaculated. BG testified that neither he nor JW left (which is what they wanted to do) because Wease impressed upon them that they would be in trouble if they left or if they told about what happened. When asked by the prosecutor how many times these sorts of things happened, BG responded ". . . too many to count . . . ," and that it went on from the time he was nine or ten years old until he was thirteen or fourteen (2000–2005). The prosecutor continued questioning, and BG related that it happened ". . . about three to five times a month, if not more." The same testimony was repeated yet again with additional details. BG also related an incident that occurred in Utah, while they were there camping, wherein the same threesome engaged in oral sex. The incidents were reviewed yet again, and some additional ones mentioned by BG during the course of that review. Also during the course of this lengthy testimony, BG related that Wease bribed both him and JW with a variety of items including baseball cards, use of a dune buggy, camping and hunting trips, etc. In addition, Wease threatened them with getting in "trouble," not being allowed to play together (they were like brothers), and he even threatened both himself (i.e., suicide), and them, with a gun on several occasions.

[¶ 18] At this point in the testimony, the district court called a recess and invited counsel into his chambers. This discussion followed:

THE COURT: During the course of this testimony, there's been testimony of I don't know how many acts of sexual relations with this young man that have been testified to. I don't know and I'm sure as heck the jury, unless its covered, would know which one is charged and which one is 404. Maybe that will come out. But I am going to give a limiting instruction at the conclusion of the direct evidence. Mr. Peterson and Mr. Skog, you can go out and discuss this, but I want the instruction to first tell that the testimony of this witness involved evidence of incidents on such and such, which is the charged offense. All of the rest is being offered to prove—and,

again, you can state since this is a stipulated matter between the Defense and State as to why it comes in, what the proper purpose is; and I'll instruct them that they're not to consider these other acts for any other purpose.

Now, I'll let you do that because as I'm going through and hearing all of this, I'm greatly concerned, quite frankly, about the prejudicial effect that all of these things are going to have. But I'm going to do my best to limit it to that. That's basically where we're at. So please get that done before the recess is over.

[¶ 19] Counsel apparently discussed this matter amongst themselves and then the prosecutor came back into the judge's chambers to explain why he could not do what the district court had asked. The district court then enlarged upon his concerns:

THE COURT: All right. Well, first of all, I think you've addressed a fundamental problem in this case. I realize that you get these things that involve allegations of multiple bad acts. The problem here goes to the very fundamentals behind Rule 404(b). And I don't know. I'm a little incredulous as to what you're saying. I hope you're not saying, "Judge, we don't know which one we're charging this Defendant with. The Jury can pick whichever one they want." Now, that's all I'm trying to do, is get some order out of this. But whether they ask for one or not-I, quite frankly, don't know whether it's a tactic of the Defense, if they're not asking for one, to simply create plain error. And you ought to understand that, also.

This Court has a duty not to act as the Defense attorney, to make sure that everyone here gets a fair trial. So I'm going to try to instruct the Jury so that they can weigh the evidence and what it's for as to which one is the charged count and which one is being brought in. But the purpose of 404(b), when you have other wrongs or bad acts, it can be done for a purpose and a proper purpose. I'm going to instruct the Jury that they can consider it for that proper purpose. My point in doing so is to eliminate, as best I can, the possibility that

this evidence will be considered for an improper purpose.

So if you want to object about that, Mr. Peterson, consider where you're going because the next step is you are on the verge of a mistrial.

[¶ 20] This recess continued for some considerable more time, and it was determined that the parties would reserve further addressing the trial court's concerns until the end of BG's testimony. At the end of the recess, the district court returned to the courtroom and addressed the jury as follows:

THE COURT: All right. Ladies and Gentlemen, this has been an hour long recess and I apologize for that. During the course of the case, there are legal issues that come up that we need to, sometimes, resolve as we're going. I guess we're kind of doing this on the fly. That was what had occurred during this last recess. I know it's difficult. I tell you that you can't talk about the case and I just hope that you either have a lot of fishing stories or something else when these breaks occur. We'll try to keep things moving along but you have to understand, this happens sometimes and we're doing our best.

[¶ 21] BG resumed the stand as a witness and again summarized the many pages of his earlier testimony, essentially repeating most all of Wease's bad acts again, and then testifying about several other instances of oral sex that occurred at various places throughout Lincoln County. BG also related that he engaged in sexual touching with one of his friends who was several years younger than BG. He testified that Wease had encouraged him to do that and then to get those friends to come over and they all would do it together. It is this incident that sparked an investigation into BG's behavior with his young friend (it was reported by the friend's mother). BG was contacted by the authorities about it and underwent some counseling. During that counseling, he did not reveal what he was doing with Wease because he was afraid to.

2. The statutes in effect during this time period were the same ones applicable to the Counts

[¶ 22] At the end of the direct examination of BG, it was agreed that the parties and the district court would work on a limiting instruction that could be given to the jury at the end of the cross-examination of BG. That was done as follows:

THE COURT: ... Ladies and Gentlemen, I've got what's called a limiting instruction to give you. This last witness has testified about several instances of alleged misconduct on the part of the Defendant involving this witness over a period of years. The evidence has been allowed to come to you by stipulation of the parties for two separate purposes. The first is to prove the specific crimes charged in Counts III and IV of the Information. These counts involve the first incident that the witness testified to that occurred in the Defendant's bedroom involving the Defendant, the Witness, [BG], and [JW]. All other alleged incidents are offered solely for a second purpose, that is to provide evidence of the natural progression of the facts, course of conduct and to show the Defendant's conduct with [BG]. Under the rules of evidence, these other instances of alleged misconduct may not be received into evidence to prove that the Defendant had a certain character trait and that he acted in conformity with that character trait. You are instructed that you shall not consider any uncharged acts of misconduct as proof that the defendant had a particular character trait or that he acted in conformity with that character trait.

### The Victims—[JW]

[¶ 23] The second victim to testify was JW (dob—August 26, 1989). BG was JW's best friend during the years that the crimes at issue in this case were committed. Wease was JW's adoptive father and he lived with Wease from the time he was three-years-old until October 2003. JW was the subject of Counts I and II of the complaint: [2]

### JURY INSTRUCTION NO. 16

The elements of the crime of Sexual Assault in the Third Degree, as charged in **Count I** of this case are:

involving BG.

1. Between October 1, 2002 and October 17, 2003

2. In Uinta County, Wyoming.

3. The Defendant, Allan Deon Wease

4. Inflicted sexual intrusion upon [JW]

5. The Defendant was at least four years older than [JW]

6. [JW] was under the age of sixteen years.

### JURY INSTRUCTION No. 17

The elements of the crime of Taking Indecent Liberties with a Child, as charged in **Count II** of this case are:

1. Between October 1, 2002 and October 17, 2003

2. In Uinta County, Wyoming

3. The Defendant, Allan Deon Wease

4. Knowingly took indecent liberties with [JW], a child.

[¶ 24] JW related that, when he was eight or nine years old, Wease called JW into Wease's bedroom and put his hand on JW's upper leg several times over the course of a few weeks. On each occasion, JW felt uncomfortable and left. Not long after that, Wease called JW into the bedroom, and he found Wease naked and laying face-down on the bed. He asked JW to rub his back and while JW was doing so, Wease suddenly turned over and grabbed JW. JW left the room without further incident. A day or two later, Wease called JW into the bedroom again. Wease was naked on this occasion also and was touching his "private parts." This happened several times and, at Wease's request, JW stayed longer and longer on each occasion and watched Wease masturbate. This escalated to JW also masturbating while Wease did so, and eventually led to JW permitting Wease to perform fellatio on him while Wease masturbated. JW was encouraged to do these things by promises of no chores and gifts, etc.

[¶ 25] Defense counsel objected to all of this testimony as being W.R.E. 404(b) evidence that was not a part of the stipulation to which the parties agreed. A portion of the objection was done in front of the jury, but the matter was then adjourned to chambers. The district court commented in chambers that "I'm not going to try a case like this because at least the Defendant needs to know what he's charged with. I'm sitting here as the judge trying to figure out what it is." The proceedings in chambers went on for some time with the district court admonishing counsel for not doing their respective jobs within the Wyoming Supreme Court's guidance on handling W.R.E. 404(b) evidence. The district court perceived that the stipulation they had agreed to was not up to the task and had been put in place as a way of avoiding the difficult work required by *Gleason v. State*, 2002 WY 161, 57 P.3d 332 (Wyo.2002), its predecessors, and the even more recent cases that followed on its heels. The district court denied Wease's motion for a mistrial and concluded that day of trial with this admonition to the jury:

THE COURT: Ladies and Gentlemen, I'm going to try to give you a little context for the instruction I'm going to give you. I've given you other limiting instructions. Evidence of alleged wrongful acts can be received for two purposes: One, to prove the crime charged; and the other, it can also be admitted for a limited purpose. I'll instruct you on what the limited purpose is.

Just so that you know what is going on here, one of the reasons why we have breaks is the parties have stipulated on events of other bad acts that you may hear about. There's no stipulation that they are true. That's for you to decide. This last witness, [JW], has testified about an event where the Defendant allegedly encouraged the witness to masturbate. This is not proper evidence and is stricken. You're instructed to disregard that evidence and not consider it in your deliberations.

Now, I'm hopeful—I've discussed with Counsel some of the problems that keep coming up; and, hopefully, we've arrived at a process where we may not be having so many of these recesses and delays over these issues.

[¶ 26] On the next day of trial, JW's testimony resumed. He testified that Wease was arrested and moved out of the house in late October of 2003. Based on that recollection, JW could recall that in mid-September

Wease asked JW to come into his bedroom. Wease asked JW to lock the door and to take his clothes off. Wease was lying naked on the bed and watching a video that showed men having sexual relations. Wease grasped JW's genitals with his hand for a time, but then rolled over into a face-down position and asked JW to lie on top of his back. JW further related that Wease continued to move up and down until he ejaculated. · JW also related an event that occurred on August 27 or 28, 2003, wherein he performed oral sex on Wease. While he simultaneously masturbated, Wease then performed oral sex on JW until Wease ejaculated. In further questioning, JW testified that there were other times that he did oral sex with Wease and that BG was a participant "three or four times a month." In succeeding testimony, the prosecutor asked JW to summarize how each of the many events generally went over the period of several years (locked door, clothes off, homosexual oriented pornography, oral sex and/or masturbation). Further, JW testified he did not report them because he was afraid for his life and for Wease's life. Wease threatened to kill himself or to have others kill both JW and BG if they told about what was going on. During cross-examination by the defense, JW again acknowledged that the sexual activity with Wease occurred "hundreds" of times.

[¶ 27] At the conclusion of JW's testimony, the district court gave this limiting instruction:

Ladies and Gentlemen, this last witness has testified about several instances of alleged misconduct on the part of this Defendant over a period of years. The evidence has been allowed to come to you by stipulation of the parties for two separate purposes. The first is to prove the specific crimes charged in Counts I and II of the information. All other alleged incidents are offered solely for a second purpose. That is to provide evidence of the natural progression of the facts, course of conduct and to show the Defendant's conduct with [JW]. Under the rules of evidence, these other alleged instances of alleged misconduct may not be received into evidence to prove that the Defendant had a certain character trait and that he acted in conformity with that character trait. You are instructed that you shall not consider any uncharged acts of misconduct as proof that the Defendant had a particular character trait or that he acted in conformity with that character trait.

### The Victims—[CW]

[¶ 28] CW (dob July 15, 1990) was the subject of Counts X and XI of the complaint:

#### JURY INSTRUCTION NO. 28

The elements of the crime of Third Degree Sexual Assault, as charged in **Count X** of this case are:

1. Between April 1, 2004 and July 12, 2004

2. In Uinta County, Wyoming.

3. The Defendant, Allan Deon Wease

4. Was at least 18 years of age; and

5. Defendant subjected [CW] to sexual contact, and

6. [CW] was under the age of 14 years.

#### JURY INSTRUCTION No. 29

The elements of the crime of Taking Indecent Liberties with a Child, as charged in **Count XI** of this case, are:

1. Between April 1, 2004 and May 19, 2005

2. In Uinta County, Wyoming

3. The Defendant, Allan Deon Wease

4. Knowingly took indecent liberties with [CW], a child.

[¶ 29] Wease is CW's biologic father. CW related that when he was thirteen years old, Wease stuck his hand down CW's boxer shorts and touched his penis for period of twenty minutes. This same thing happened ten to twenty times. During some of these occasions, there was pornography present (men and women doing sexual stuff) playing on the TV in the bedroom when the incidents occurred. CW testified that he did not tell anyone about these things because he "didn't want to be in trouble." It was agreed that no objectionable W.R.E. 404(b) evidence was admitted during CW's testimony, and the jury was not admonished on that subject.

**The Victims—[BJ]**

[¶ 30] BJ (dob October 9, 1990) was the subject of Count VII of the complaint. The jury convicted Wease of Count VII, even though the prosecutor conceded that the State had failed to prove all the elements of the crime as alleged in Count VII and that the jury should find Wease not guilty on that Count (did not prove that the crime occurred within the dates specified in the jury instruction on Count VII). The element not proven was the range of dates set out as part of the instruction. Nonetheless, the jury did convict, although it asked a question of the district court in an effort to clarify that situation. In response to that jury question, the district court informed the jury that arguments of counsel were not evidence. In its brief on appeal, the State proposes a theory upon which the conviction on Count VII can be affirmed, even in the light of the State's admission at trial that it did not prove that element of the crime. However, that theory is not supported by cogent argument or pertinent authority and, more importantly, the evidence in the record, taken as a whole, is not sufficient to sustain that conviction. Therefore, we will reverse the conviction on Count VII and direct that the Count be dismissed upon remand.

[¶ 31] At the conclusion of BJ's testimony, the district court once again admonished the jury about the proper use of the W.R.E. 404(b) evidence that had been included in BJ's testimony.

**The Victims—(GR)**

[¶ 32] No birth date is given in the record for GR, but on February 9, 2006, she was 22 years of age. GR is not a biologic child of Wease, but Wease was married to GR's mother for a time. GR was the subject of Counts VIII and IX:

### JURY INSTRUCTION No. 25

The elements of the crime of Sexual Assault in the Second Degree, as charged in **Count VIII** of this case are:

1. Between January 1, 1993 and October 1, 1995

2. In Uinta County, Wyoming

3. The Defendant, Allan Deon Wease

4. Inflicted sexual Intrusion on [GR], and

5. At the time of that sexual intrusion, [GR] was less than twelve years of age, and

6. The Defendant was at least four years older than [GR].[3]

### JURY INSTRUCTION No. 26

The elements of the crime of Taking Indecent Liberties with a Child, as charged in **Count IX** of this case are:

1. Between January 1, 1993 and October 1, 1995

2. In Uinta County Wyoming

3. The Defendant, Allan Deon Wease

4. Knowingly took indecent liberties with [GR], a child.

### JURY INSTRUCTION NO. 27

You are instructed that in **Count IX** the State offers two alternative theories on which it asks you to convict the defendant of Indecent Liberties With a Child. The first theory the State propounds is that the defendant manipulated [GR's] breasts. The second theory the State propounds is that the defendant placed [GR's] hand over Allen Deon Wease's penis and then had [GR] manually masturbate him.

Because you are being asked to consider these alternative theories propounded by the State, it is a requirement of the law that to convict the defendant you must agree unanimously on the basis for a conviction. A conviction cannot be returned based on some jurors being convinced beyond a reasonable doubt that one theory has been proven, and all the rest of the jurors believing another theory has been proven beyond a reasonable doubt.

[¶ 33] In her testimony, GR related that just before Christmas in 1993, Wease asked

---

**3.** The elements stated in this Count track with Wyo. Stat. Ann. § 6–2–303 as it appeared from 1993 to 1995.

her to come into his bedroom and lie down on the bed with him because he was lonely. GR was clad in a longish nightgown and had panties on underneath. She laid there for 30–45 minutes and then got up because she had to go to school. This same scenario played out several times a week for over a month. In the months following these episodes, Wease began asking GR to lie on top of him. At first he would be under the covers, but eventually he would be on top of the covers, clad only in a tiger striped Speedo. This escalated to GR sitting on top of Wease, straddling him, and he rubbing her breasts, legs, thighs and vaginal area over her nightgown (not touching her skin). On subsequent occasions, Wease began touching those same areas underneath her clothing. These incidents happened many times and escalated further to Wease removing GR's clothing altogether and him kissing her on her neck, breasts, stomach and vaginal area. Eventually Wease began sticking a finger into GR's vagina and he did this several times a week for several months. Finally, Wease began placing GR's hand on his penis and he would guide her hand with his in an up and down motion. This continued over a period of many months and perhaps years, until she moved away from Wease's home to live with her father. The subject of child molestation came up in a discussion with her siblings, and GR said it was no "laughing matter" and that it had happened to her. The siblings told GR's step-mother and the step-mother took GR to see her uncle who is an attorney. These events occurred when she was eleven years old. GR never went back to live with Wease again. At the conclusion of GR's testimony, the district court gave another limiting instruction similar to those given earlier in the proceedings.

**The Victims—[JS]**

[¶ 34] JS (dob August 4, 1983) was the subject of Counts V and VI of the complaint:

**JURY INSTRUCTION NO. 22**

The elements of the crime of Sexual Assault in the Third Degree, as charged in **Count V** of this case are:

1. Between April 1, 1994 and October 1, 1996
2. In Uinta County, Wyoming.
3. The Defendant, Allan Deon Wease
4. Inflicted sexual intrusion upon [JS]
5. The Defendant was at least four years older than [JS]; and
6. [JS] was under the age of sixteen years.

**JURY INSTRUCTION No. 23**

The elements of the crime of Taking Indecent Liberties with a Child, as charged in **Count VI** of this case are:

1. Between April 1, 1994 and October 1, 1996
2. In Uinta County Wyoming
3. The Defendant, Allan Deon Wease
4. Knowingly took indecent liberties with [JS], a child.

[¶ 35] JS testified that his brother is BG discussed above (¶¶ 14–22, supra). He is seven years older than BG. He would visit the Wease household three to five times a week during his childhood. In response to the question how often did Wease make you feel uncomfortable, JS responded, "It was a lot"—up to 20 times a month. The first time such an incident occurred was when he was 12, in about 1995. While on a camping trip with Wease, JS slept on the floor between the beds that were used by Wease and his wife. During the night, Wease reached down and grabbed JS's penis. A couple of days later when JS was at Wease's house, Wease was cleaning out that same camper. He asked JS to come into the camper. Wease asked if he had told anyone what had happened in the camper a couple days before, and JS responded, "No." Wease then pulled down JS's pants and performed fellatio on him for about five minutes. When JS left the camper, Wease reminded him not tell anybody. A few days after that incident, Wease called JS into his bedroom and once he was in there, Wease took JS's pants off and performed fellatio on him for about five minutes. This happened many times after that in the bedroom ("99% of all things" thereafter occurred in that bedroom). Eventually, this escalated to both JS and Wease

getting naked on the bed and performing fellatio on each other. They also looked at pornographic magazines and movies that Wease kept in a brief case. JS also testified about sexual acts he engaged in with a somewhat younger friend that eventually was reported to the authorities. That testimony indicated that Wease encouraged him to "try to bring somebody down to the house . . . or should try to get them to do different things at their house." At the conclusion of JS's testimony, another limiting instruction was given to the jury.

### The Victims—[Jm.W]

[¶ 36] Jm.W (dob November 28, 1984) was the last victim to testify. He was the biologic child of Wease. He was the subject of Count XII:

> #### JURY INSTRUCTION No. 30
>
> The elements of the crime of Taking Indecent Liberties with a Child, as charged in **Count XII** of this case are:
> 1. Between August 1, 2000 and November 28, 2002
> 2. In Uinta County Wyoming
> 3. The Defendant, Allan Deon Wease
> 4. Knowingly took indecent liberties with [Jm.W], a child.

[¶ 37] Jm.W testified that when he was sixteen or seventeen years old, he was at a restaurant owned by Wease and his family making cotton candy for the Fourth of July parade. Wease brought out a black briefcase that contained, inter alia, homosexual pornography. During this testimony, another act of sexual misconduct was called to the attention of the jury that was not admissible evidence. The district court directed that the material be stricken and that the jury disregard it. A couple of months after the Fourth of July incident, Wease asked Jm.W to come into his bedroom and rub his shoulder and when Jm.W began to do so, Wease reached out and touched his penis.

[¶ 38] The final specific incident described by Jm.W occurred when he was seventeen. He had just finished his shower and was dressed only with a towel around his waist. Wease reached up under the towel and fondled Jm.W's penis for a duration of approximately five minutes. Jm.W called his friend JD for help, and Jm.W stated that Wease tried to get JD also to do sexual things with him. Jm.W testified that Wease tried to bribe him to get his friends to come over and hang out so that Wease could try to engage in sexual activities with them. Jm.W also narrated the events that led up to Wease leaving the family home. After a fight Wease had with his wife, he went into the bedroom. There were a lot of banging noises and then Wease broke through the bedroom door with a baseball bat, brandishing a shotgun. He held the shotgun to his wife's head. Jm.W struggled with Wease and someone called 911 and, eventually, the police came and arrested Wease. The final phase of Jm.W's testimony brought the story back to Jm.W being concerned about Wease having talked about suicide and that he went to check on him and found him on the bedroom floor stabbed in the chest. This more or less brought the story full circle—and how Wease's advances to a co-worker set in motion the discovery of his multitude of sex crimes.

[¶ 39] After Wease was beginning to recover from his wounds, etc., Wease called Jm.W and told him that he was in trouble for molesting children and asked him to dispose of the briefcase that Jm.W had once seen at the café, as well as some other totes he had not previously been aware of. Wease called back a second time to check to make sure Jm.W had disposed of the pornography, and Jm.W told him he had but, in fact, he did not dispose of that material. At the conclusion of Jm.W's testimony, the district court gave this limiting instruction:

> THE COURT: Ladies and Gentlemen, I have a limiting instruction. The last witness testified about several instances of alleged misconduct on the part of the Defendant involving this witness. I'm going to change what I'd told you before so that it can be kind of clarified. The testimony involving this witness—or at least the charge surrounds an event that occurred in the home—or allegedly occurred in the home of the Defendant where there was sexual contact, attempting to touch the

witness' penis and then manually manipulating the penis. There was other evidence involving the pornography and so forth that was offered for a limited purpose, to get rid of the briefcase, and that did not come in for a limited purpose. So this first category that I talked about, the touching, was to prove the specific crimes charged in Count XII of the Information. All of the other alleged incidents are offered solely for a second purpose and that is to provide evidence of a natural progression of the course of conduct and to show the Defendant's conduct with this witness. Under the Rules of Evidence, these other instances of alleged misconduct may not be received into evidence to prove the Defendant had a certain character trait and that he acted in conformity with that character trait. You're instructed that you shall not consider any uncharged acts of misconduct as proof that the Defendant had a particular character trait or he acted in conformity with that trait.

[¶ 40] The State's final witness was Kirby Lamb, a patrol sergeant with the Uinta County Sheriff. Sergeant Lamb obtained two search warrants to search locations that were inhabited by Wease. At one location they found "a pistol pump penis pump." He also seized a tote filed with 34 VHS tapes. Some of the tapes were removed from the container in which they were stored and their titles read to the jury: *Kinky Bi–Sex; Hot Buddies; It's No Accident;* and *Gay for the Weekend.* The Sergeant indicated that he had watched brief portions of the tapes to see if they comported with their labeling ("... turned them on, saw that it—you know, it appeared to be porn, turned it off. So the parts I saw, yes, did conform to that."). A briefcase containing pornographic magazines was introduced into evidence, as was the Weases' decree of divorce, and the paperwork relating to Wease's conviction for reckless endangerment. Finally, the shotgun used in the reckless endangerment incident was introduced into evidence.

[¶ 41] In the instructions to the jury, the trial court included this:

INSTRUCTION NO. 8

The Court has admitted the testimony of the alleged victims and one additional witness that the Defendant committed uncharged improper acts upon them for the limited purpose of establishing the natural progression of the events, the course of conduct and to show the Defendant's conduct with the alleged victim. The Court had admitted Exhibits 16 and 17 [reckless endangerment conviction] for the limited purpose of corroborating another witness' testimony of an event that occurred in the Defendant's home.

You are not to consider this evidence for any purpose except the limited purpose for which it was admitted.

[¶ 42] The State's closing argument consisted of a terse review of the evidence that supported each of the twelve counts, with the exception of Count VII, as noted above, wherein the State conceded that it had failed to prove its case. Not a single mention was made of any of the W.R.E. 404(b) evidence.

### DISCUSSION

**Illegal Sentence**

[¶ 43] Wease contends that Count V (sexual assault in the third degree), of which he was convicted, was alleged to have occurred between April 1, 1994, and October 1, 1996. At the time he committed the crime at issue, the sentence for third degree sexual assault was punishable by imprisonment for not more than five years. Wyo. Stat. Ann. § 6–2–306 (Michie 1977). In 1997, the maximum penalty was increased to fifteen years. (1997 Wyo. Sess. Laws, ch. 135 § 1). Wease was sentenced to not less than ten nor more than fifteen years on that Count. A sentence in excess of that authorized by the legislature is illegal and is a matter that we review *de novo. Spencer v. State,* 2005 WY 105, ¶ 11, 118 P.3d 978, 982 (Wyo.2005); also see *Schiefer v. State,* 774 P.2d 133, 135–36 (Wyo. 1989). The State agrees that the sentence imposed is illegal because it exceeds that authorized by the legislature, that the sentence imposed on Count V must be vacated, and that this matter must be remanded to

the district court for a new sentencing proceeding on that matter. We will so direct.

### Sufficiency of the Evidence Count VII

[¶ 44] This issue arises because Count VII included as one of its elements that Wease performed fellatio on BJ sometime between August 1, 2004, and September 30, 2004. The State concedes that the closest BJ came to giving testimony that fit within that element of the crime, was that it occurred in April or May of 2004 (although his direct testimony was that it occurred in April or May of 2003). However, the State's argument continues, if BJ's testimony is read very carefully and with the assumption that he merely misspoke about which year he completed the seventh grade, then his testimony is only a few months off. For this proposition, the State relies on this holding we made in a similar case:

> One of the central problems encountered in this case was the inability of either DC or WC to recall with much specificity dates, or even general time frames, for the occurrences of the various sexual encounters with Alicea. The prosecutor seemed to have difficulty in phrasing her questions; to the extent the questions were satisfactory, the trial court frequently interjected himself, and the children seem to have been frightened and ill at ease testifying in the courtroom. Instruction Nos. 2–6 listed the elements of each of the six counts charged. Included among those elements were dates. Most of the "time" elements of those instructions were stated as being between a period of months, e.g. "between the time period of October 1990, through May 1991," "February 1992 through March 1992," and "during the summer of 1993." That portion of those instructions was modified by Instruction No. 10:
>
> > Even though you have been instructed that the State must prove beyond a reasonable doubt that a crime was committed within a specified time frame, the failure to establish with precision that the crime occurred within that time frame is not fatal, especially in the case of alleged abuse to children. A witness's

[sic] inability to recall specific time frames may be taken into account in weighing the credibility of any witness, along with those factors mentioned in the last paragraph of instruction No. 1.

We have held that where the specific date is not a required element of the crime, then alleging a general time period, in lieu of a specific date, is sufficient to give a defendant notice and allow him to adequately prepare a defense. *Vernier v. State*, 909 P.2d 1344, 1350–52 (Wyo.1996); *Jackson v. State*, 891 P.2d 70, 75 (Wyo. 1995). Indeed, we have even held that it is sufficient for a finding of guilt that the prosecution establish the transaction rather than the exact dates in question. *Brown v. State*, 817 P.2d 429, 437–38 (Wyo. 1991). However, we are unable to stretch the spirit, as well as the letter, of those cases to fit the use of Instruction No. 10 as it was employed in this case. The instruction makes it impossible to differentiate between Count I and Count II, between Count III and Count IV, or between Count V and Count VI, because the elements of each of those pairs became exactly the same as a result of the challenged instruction. It is as likely as not that the jury may have found Alicea guilty twice for the exact same act. Therefore, we disapprove of the instruction and find that its use in this case necessitates that we reverse the Judgment and Sentence to the extent Alicea was found guilty of Count II, Count IV, and Count VI.

*Alicea v. State*, 13 P.3d 693, 699–700 (Wyo. 2000)

[¶ 45] In this case, an instruction like that described in *Alicea* was not given to this jury, nor was the jury given additional directions along the lines of those contained in Alicea's Instruction 10.

[¶ 46] In addressing a claim of insufficiency of the evidence, we must determine whether or not any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. When considering a claim of the sufficiency of the evidence, we review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence

favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence. We will not re-weigh the evidence nor will we re-examine the credibility of the witnesses. *Williams v. State*, 2006 WY 131, ¶ 45, 143 P.3d 924, 935 (Wyo.2006); *Perritt v. State*, 2005 WY 121, ¶ 9, 120 P.3d 181, 186 (Wyo.2005) (and cases cited therein).

[¶ 47] After careful consideration of this issue, we conclude that in light of the instructions given to the jury, there was not sufficient evidence to sustain Wease's conviction on Count VII. Therefore, that conviction is vacated and on remand, the district court shall dismiss Count VII.

## Overwhelming and Prejudicial W.R.E. 404(b) Evidence

 [¶ 48] We embark on our discussion of this subject taking note that hundreds of incidents of other misconduct, bad acts, crimes, and other examples of reprehensible behavior were called to the attention of the jury during the course of the witnesses' testimony. It is safe to say that every witness who appeared recited one or more prior bad act.

[¶ 49] W.R.E. 404(b) provides:

(b) *Other Crimes, Wrongs, or Acts.*— Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[¶ 50] The basis for the prosecution's introduction of this evidence was articulated, albeit somewhat differently from time to time, in the limiting instructions given to the jury by the district court. The prosecutor's goal was to tell, as briefly as possible, the story of Wease's interaction with each of the victims, for the limited purposes, *inter alia:* (1) of establishing the natural progression of the events; (2) the course of conduct; and (3) to show Wease's patterns of conduct with the alleged victims. With respect to each individual victim, it was then the prosecutor's strategy to focus the jury's attention on one or two particular occurrences that constituted the crimes charged in the various counts. The defense did not file a pretrial demand for notice of the State's intent to use W.R.E. 404(b) evidence, but the State filed a notice of its intent to do so. This notice was a fairly detailed statement of what sorts of evidence the State intended to produce and the witnesses they expected to use in that regard. As a consequence, Wease made no pretrial demand concerning such evidence, and under these circumstances, none would have been required. No formal hearing was held, as is contemplated by our governing case law, but the matter was a subject of frequent and lengthy discussions as the trial progressed. In place of the hearing we have mandated in our case law, the parties appeared to have agreed/stipulated to what W.R.E. 404(b) evidence was fair game, and what was not, under the circumstances of this case.

[¶ 51] As the trial progressed, it became clear that this agreement/stipulation was not very well defined and the district court was called upon, on several occasions, to provide the structure and discipline that our construction of Rule 404(b) demands. Thus, we continue our discussion by setting out once again our prevailing jurisprudence with respect to the admission of W.R.E. 404(b) evidence. We turn to our decision in *Gleason*, ¶¶ 16–20, 57 P.3d at 339–41, for that purpose:

The structure of W.R.E. 404 is significant in the analysis of the admissibility of uncharged misconduct evidence. First, subsection (a) forbids use of evidence of a person's character to prove that he acted in conformity with that character at a particular time. For instance, in a prosecution for battery, the prosecutor cannot introduce evidence that the defendant has a violent temper for the purpose of proving that, given his violent temper, the defendant must have committed the battery. W.R.E. 404(a) goes on to provide, however, that there are circumstances in which evidence of a person's character may be admitted to prove that he acted in conformity therewith on a particular occasion. In the specific situations enumerated, character evidence is admissible in direct contravention of the general principle that character

evidence is not admissible to prove conduct.

The pattern of W.R.E. 404(b) is not the same. The general principle that character evidence may not be admitted to prove conduct remains intact in the first sentence. But "[e]vidence of other crimes, wrongs, or acts," which logically may or may not be character evidence, is admissible to prove things other than character. Consequently, the exceptions to the rule found in subsection (a) are not of the same nature as those found in subsection (b). The former allow evidence of character to prove conduct; the latter allow evidence of specific instances of conduct to prove "consequential facts" such as intent or knowledge. *Virgilio v. State*, 834 P.2d 1125, 1128 (Wyo.1992); *Grabill v. State*, 621 P.2d 802, 808 (Wyo.1980). Under neither subsection is evidence admissible if the thrust of the evidence is only to demonstrate that the defendant has a disposition to commit crimes. *Daniel v. State*, 923 P.2d 728, 733 (Wyo.1996) (quoting *Dean v. State*, 865 P.2d 601, 606 (Wyo.1993), abrogated and modified on other grounds by *Vigil v. State*, 926 P.2d 351 (Wyo.1996)).

Admissibility under W.R.E. 404(b) is not limited to the purposes set forth in the rule, and we have adopted a liberal approach toward admitting uncharged misconduct evidence. *Mitchell v. State*, 865 P.2d 591, 596 (Wyo.1993); *Bishop v. State*, 687 P.2d 242, 245 (Wyo.1984), cert. denied, 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985), abrogated on other grounds by *Vigil*, 926 P.2d at 356–57. The listed exceptions are illustrative rather than exclusive. *Gezzi v. State*, 780 P.2d 972, 974 (Wyo.1989). Nevertheless, because uncharged misconduct evidence carries an inherent danger for prejudice, we have also adopted a mandatory procedure for testing its admissibility: (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. *Vigil*, 926 P.2d at 357 (quoting *United States v. Herndon*, 982 F.2d 1411, 1414 (10th Cir.1992)). We do not apply this test on appeal; rather, it is intended to be conducted by the trial court. *Beintema v. State*, 936 P.2d 1221, 1224 (Wyo. 1997). Our role is to determine whether admission of the evidence was error. *Id.*; *Spencer v. State*, 925 P.2d 994, 997 (Wyo. 1996). Generally, the standard for review of rulings under W.R.E. 404(b) is abuse of discretion. *Johnson v. State*, 936 P.2d 458, 462 (Wyo.1997) (quoting *Sturgis v. State*, 932 P.2d 199, 201 (Wyo.1997)). However, where no trial objection occurred, the plain error standard applies. *Beintema*, 936 P.2d at 1224; *Spencer*, 925 P.2d at 997. To prove plain error, an appellant must demonstrate that the record clearly shows an error that has transgressed a clear and unequivocal rule of law and has adversely affected a substantial right of the appellant. *Weidt v. State*, 2002 WY 74, ¶ 8, 46 P.3d 846, 851 (Wyo.2002).

The trial court's determination that evidence of similar sexual misconduct is admissible in a child sexual abuse case to prove such purposes as motive and intent, where a defendant denies any wrongdoing, is certainly not unprecedented. See, for example, *Brower v. State*, 1 P.3d 1210, 1214 (Wyo.2000) (in trial for indecent liberties with a minor, testimony of victim's sister as to similar misconduct by defendant with her admissible to prove motive); *Rigler v. State*, 941 P.2d 734, 738 (Wyo. 1997) (in child sexual abuse case, evidence of similar previous misconduct with different victim admissible to prove modus operandi, preparation, plan, intent, and credibility of victim); *Daniel*, 923 P.2d at 734–35 (in prosecution for indecent liberties, testimony of six other children about sexual activities with defendant admissible to prove course of conduct); *Jackson v. State*, 891 P.2d 70, 75–76 (Wyo.1995) (victim's testimony of prior sexual acts by defendant step-father admissible in indecent liberties case as proof of motive, course of conduct, and credibility of victim); *Johnson v. State*, 872 P.2d 93, 95–98 (Wyo.1994) (in indecent liberties case, testimony of social

worker that defendant had admitted previous sexual molestation of a ten-year-old girl admissible to prove motive, intent, and identity); *Mitchell*, 865 P.2d at 598–99 (in trial for second-degree sexual assault of a ten-year-old girl, defendant's admission of sexual arousal during prior sexual activity with a three-year-old niece, for which the defendant was convicted, admissible to prove motive); *Gezzi*, 780 P.2d at 977–78 (in prosecution for indecent liberties with daughter, testimony of older daughter as to similar misconduct with her admissible to prove defendant's motive and victim's credibility); *Brown v. State*, 736 P.2d 1110, 1113 (Wyo.1987) (in prosecution for incest, testimony by victim and her half-sister implicating defendant in prior sexual abuse admissible because aberrant sexual behavior is probative of motive); and *Elliott v. State*, 600 P.2d 1044, 1048–49 (Wyo.1979) (in trial for second-degree sexual assault, testimony of victim's older sister as to similar misconduct by defendant with her admissible to prove motive based on pedophilia). The evidence of uncharged misconduct alleged in the instant case is similar to that admitted in these many cases.

With one exception, the uncharged misconduct evidence admitted in this case was subjected to an appropriate *Vigil* analysis. M.F.'s testimony, for instance, was substantially as it had been outlined in the State's notice of uncharged misconduct evidence and as it had been described during the first motion hearing. The trial court and counsel discussed and debated the testimony in the context of W.R.E. 404(b) and the Vigil test, and during the final hearing, the trial court made the necessary Vigil findings. Gleason has not shown an abuse of discretion by the trial court in admitting M.F.'s testimony. To the contrary, the record reflects the trial court's careful pretrial attention to this issue. The trial court's analysis included the consideration of prejudice required by W.R.E. 403 and Vigil. The trial court articulated a consis-

tent and legitimate basis for its rulings, in which case we do not reverse. *Johnson*, 936 P.2d at 462 (quoting *Sturgis*, 932 P.2d at 201). And finally, the trial court gave an appropriate instruction, limiting the jury's consideration of the uncharged misconduct evidence to the proper purposes for which it had been offered.

[¶ 52] As can be readily discerned from our description of the testimony of the victims as set out more fully above, the W.R.E. 404(b) testimony was admitted for a proper purpose, and most importantly, largely was merely a recitation that told the story of the interactions between Wease and his victims—the history of their relationships, warts and all. Much as we did in *Gleason*, we conclude that the uncharged misconduct evidence was admitted for one or more purposes proper under Rule 404(b). And see *Lemus v. State*, 2007 WY 111, ¶¶ 45–46; 162 P.3d 497, 509 (Wyo.2007).

[¶ 53] Here, the district court did not formally perform the pretrial analysis made mandatory by *Vigil* to test its admissibility.[4] Rather, he left the parties to their own devices in that regard, which they appear to have performed adequately, although just barely so. The trial court did balance the probative value of the evidence against its potential for unfair prejudice. Although these are less than ideal circumstances, we conclude that the district court did not abuse its discretion in admitting the Rule 404(b) evidence.

[¶ 54] We conclude this section of the opinion with an iteration of what we viewed as a preferred (although not necessarily exclusive) method for fully testing the admissibility of such evidence in this very difficult genre of criminal activity:

Despite the resolution of this issue, we feel compelled to address in more detail the difficulties encountered in the appellate review of the admission of uncharged misconduct evidence under W.R.E. 404(b). The primary step in propounding un-

---

4. (1) The evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the purpose for which it was admitted. *Vigil v. State*, 926 P.2d 351, 357 (Wyo.1996).

charged misconduct evidence is identification of a proper purpose for its admission. In that regard, we have previously held that the State need not pinpoint but one purpose for admission of such evidence. *Sturgis*, 932 P.2d at 203. Nevertheless, it is incumbent upon the proponent to identify such purpose or purposes with specificity because, without such specificity, the balance of the *Vigil* test cannot be applied. For evidence to be relevant, we must know the fact question to which it is relevant. For evidence to be probative, we must know what it is meant to prove.

For proper appellate review of the admissibility of evidence under W.R.E. 404(b), the record must reflect that the trial court required the State not only to identify the proper purpose for which uncharged misconduct evidence is being offered, but also to explain how or why it is probative, and why it is more probative than prejudicial. In that regard, we have twice set out in a footnote the process that should be followed by the trial court in making that analysis. To make sure there is no doubt in the future that this is a required process, we will repeat it now, in the body of this opinion:

In determining the probative value of prior bad acts evidence, the trial court should consider the following factors:

1. How clear is it that the defendant committed the prior bad act?

2. Does the defendant dispute the issue on which the state is offering the prior bad acts evidence?

3. Is other evidence available?

4. Is the evidence unnecessarily cumulative?

5. How much time has elapsed between the charged crime and the prior bad act?

Evidence is unfairly prejudicial if it tempts the jury to decide the case on an improper basis. In balancing against its probative value the unfair prejudice created by the evidence, the trial court should consider the extent to which the evidence distracts the jury from the central question whether the defendant committed the charged crime. The trial court should weigh these additional factors against the probative value of the evidence:

1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.

2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.

3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.

4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.

5. The comparable relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).

6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act.

*Rigler*, 941 P.2d at 737 n. 1 (*citing Dean*, 865 P.2d at 609–10 n. 2).

In *Rigler*, 941 P.2d at 737–38, we held that, so long as the record revealed that the trial court had subjected proposed uncharged misconduct evidence to the appropriate test of its probative value and prejudicial effect, the trial court need not make express findings on the record on each of these factors. Since that opinion was published, however, we have repeatedly been called upon to assess a trial court's exercise of discretion on such rulings, and we now remind the trial courts that, while

express findings on each factor are not necessary, abuse of discretion, or the lack thereof, cannot be determined by reviewing a record that contains no information as to how that discretion was exercised.

We have a well-established standard for analyzing claims for abuse of discretion:

We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. *Griswold v. State*, 2001 WY 14, ¶ 7, 17 P.3d 728, ¶ 7 (Wyo.2001). Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Id.* "In the absence of an abuse of discretion, we will not disturb the trial court's determination." *Id.* The burden is on the defendant to establish such abuse. *Trujillo* [*v. State*], 2 P.3d [567] at 571 [(Wyo. 2000)].

*Skinner v. State*, 2001 WY 102, ¶ 25, 33 P.3d 758, 766 (Wyo.2001), cert. denied, 535 U.S. 994, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002). In applying that standard, we cannot determine whether conclusions were drawn from objective criteria if we do not know what criteria were applied. We cannot determine whether sound judgment was exercised under the circumstances if we do not know what circumstances were considered. We cannot determine whether the trial court acted arbitrarily or capriciously if we do not know what the trial court did in reaching its decision.

In future cases involving the admissibility of evidence under W.R.E. 404(b), the record shall reflect the trial court's identification of the purpose or purposes for admission of the evidence, the findings and conclusions establishing relevance and probative value, and the factors considered in balancing probative value against the potential for unfair prejudice. The "shotgun approach" of listing every conceivable purpose for admissibility, followed by a bald statement that probative value outweighs prejudicial effect will no longer be suffi-

cient. While the trial court need not make an express finding on every factor from Dean and Rigler, the record must contain sufficient findings to support the trial court's conclusions. The burden, of course, will be upon the proponent of the evidence to supply the foundation for its admission.

The question of what must be shown to prove relevancy is not now directly before this Court. Nevertheless, because we intend by this opinion to "tighten up" the procedures for the admission of uncharged misconduct evidence under W.R.E. 404(b), we will address the point. Often, for example, the prosecutor simply states that evidence of prior sexual misconduct is relevant to prove motive or intent, and the trial court simply agrees, with nothing in the record substantiating either the prosecutor's declaration or the trial court's conclusion. In *Brown*, 736 P.2d at 1111–14, and *Elliott*, 600 P.2d at 1047–48, we approved of this approach, largely on the ground of precedent in other states:

We note that in cases involving sexual assaults, such as incest, and statutory rape with family members as the victims, the courts in recent years have almost uniformly admitted such testimony.

*Elliott*, 600 P.2d at 1048. We made the further statement in *Elliott* that "[o]ne who is a paraphiliac, whose preference or addiction for unusual sexual practices occurs in the form of pedophilia, could well be recognized as having a motive to commit the acts complained of by the victim." *Id.* at 1049. Similarly, in *Brown*, 736 P.2d at 1113, we opined that "[i]f the accused had a predilection to deviant sexual practices with young female relatives, it would not be unreasonable for the trier of fact to determine that he had a motive to commit the acts complained of by the victim in this case."

The question is whether the inference of such a motive is something that can be drawn by the jury, without some level of evidence that would suggest the inference is appropriate. An illustrative case may be helpful. In Arizona, the courts have

recognized a special exception to the general rule of inadmissibility whereby prior acts involving "sexual aberration" are admissible to prove the defendant's propensity to commit a similar crime. *State v. Roscoe*, 184 Ariz. 484, 910 P.2d 635, 642, cert. denied, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996). The admission of such evidence, however, requires sufficient foundation:

> The admissibility of the prior act depends initially upon its relevancy, which involves complicated questions of sexual deviancy in a sophisticated area of medical and scientific knowledge. [We are] not prepared to resolve such questions in the absence of such expert knowledge.

*State v. Treadaway*, 116 Ariz. 163, 568 P.2d 1061, 1065 (1977). In other words, it is not appropriate to draw an inference without adequate basis. It would seem that this would apply to any inference, not just the inference of propensity.

Not all inferences, needless to say, will require proof by expert testimony. The inference of identity that may follow from evidence of a signature crime, for instance, is something that can be drawn without expert help. The point remains, however, that, for purposes of appellate review, the record should contain such information as was relied upon by the trial court in determining to allow the jury to draw an inference from the evidence admitted under W.R.E. 404(b)

*Gleason*, ¶¶ 26–33, 57 P.3d at 342–44.

[¶ 55] We have described the general pattern of our customary usage with respect to child molestation cases about as definitively as we are able to do, given the complexities of the application of W.R.E. 404(b) and the infinite variations that continue to appear on a case by case basis. *Mitchell v. State*, 865 P.2d 591, 595–600 (Wyo.1993). We have continued to follow that pattern during the years since *Mitchell's* publication, although that adherence might not always have been absolutely consistent in every case. However, we apply that pattern in the instant case. Although we have not adopted F.R.E. 414, our jurisprudence is not inconsistent with the approach the federal courts have taken in

this same area. Certainly, reference to the rule and its accompanying interpretive case law can serve as a helpful guide in such cases.

**Federal Rule 414**

**Evidence of Similar Crimes in Child Molestation Cases**

(a) In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

(b) In a case in which the Government intends to offer evidence under this rule, the attorney for the Government shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least fifteen days before the scheduled date of trial or at such later time as the court may allow for good cause.

(c) This rule shall not be construed to limit the admission or consideration of evidence under any other rule.

See generally, 2 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence*, §§ 4:84 through 4:86, at 335–385 (3rd ed.2007); 23 Charles Alan Wright and Kenneth W. Graham, *Federal Practice and Procedure*, Evidence §§ 5411A, 5412A, 5414A, 5415A, 5416A, 5417A (Supp.2007).

[¶ 56] In many respects, in this case the proverbial train was off the track from the very outset, in terms of compliance with both the antecedents of *Vigil* and *Gleason*, as well as the cases that have followed after them. To its credit, the district court repeatedly endeavored to get the train righted as the trial progressed. A saving grace here is that the vast majority of the 404(b) evidence was so interwoven with the "grooming" process that Wease used to entice his victims into the specific illegal acts that were the subject of the eleven convictions that we intend to affirm, that it is difficult to even categorize much of the testimony as 404(b) evidence. Although the process used in this case was far from perfect and did not conform with

our guiding precedents, we are able to comfortably conclude that the error, if any, was harmless. W.R.A.P. 9.04 ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court."). We also take some comfort in the circumstance that the evidence against Wease was overwhelming. His only apparent defense was that the victims were lying to cover up their own immoral conduct, a defense that was not supported by a single shred of evidence.

**Ineffective Assistance of Counsel**

[¶ 57] Wease contends that his defense counsel was ineffective in presenting a meaningful defense for Wease. Wease argues, "Defense counsel agreed to the admission of hundreds of acts of uncharged misconduct, and then—until prodded to do so by the trial court—made no effort to ensure (1) that either he or the jury could distinguish the charged from the uncharged conduct, and (2) that the jury would use the uncharged conduct only for the limited purpose for which the parties had stipulated it was admissible. In other words, it is apparent that defense counsel had devised no strategy for dealing with the extensive uncharged misconduct evidence which he knew was going to come in at trial." Wease contends that defense counsel was deficient because he entered into an ill-defined, open-ended stipulation that gave the State carte blanche to introduce evidence of prior bad acts. Wease contends that his attorney failed to ask for limiting instructions at times they were needed. He also asserts that defense counsel failed to address the lack of more specific notice when the State did file a notice of intent to use W.R.E. 404(b) evidence. Finally, Wease contends that defense counsel failed to object to erroneous, confusing, and/or otherwise inadequate limiting instructions that the district court gave with some considerable liberality and frequency. All of this added together, Wease contends, prejudiced his right to a fair trial and the judgment and sentence must be reversed.

[¶ 58] The applicable standard of review is well-known to Wyoming litigants:

In reviewing claims of ineffective assistance of counsel, our paramount consideration is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Gleason v. State*, 2002 WY 161, ¶ 44, 57 P.3d 332, [346–47] (Wyo.2002). An appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Ordinarily, he must also demonstrate that prejudice resulted. Under this test, the inquiry is whether or not counsel rendered the assistance a reasonably competent attorney would have offered and, if not, whether his failure to do so prejudiced the defense of the case. *Id.* This two-part test, the Strickland test, is the test we normally apply in reviewing ineffectiveness claims. . . .

We examine the conduct of defense counsel in light of all the circumstances in determining whether the identified acts or omissions fall outside the ambit of professionally competent assistance, bearing in mind the function of counsel is to make the adversarial testing process work in every case. *Dickeson v. State*, 843 P.2d 606, 609 (Wyo.1992). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Gleason*, 2002 WY 161, 57 P.3d 332. We do not evaluate the efforts of counsel from a perspective of hindsight but endeavor to reconstruct the circumstances surrounding the challenged conduct and evaluate the professional efforts from the perspective of counsel at the time. *Dickeson*, 843 P.2d at 609. We invoke a strong presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judgment. *Id.* The burden is on the defendant to overcome this presumption that, in light of the circumstances, the challenged action or failure of the attorney might be considered sound trial strategy. *Id.*

*Leyva v. State,* 2005 WY 22, ¶ 19, 106 P.3d 873, 878 (Wyo.2005) (quoting *CLC v. State,* 2004 WY 2, ¶ 11, 82 P.3d 1235, 1238–39 (Wyo.2004)). We have also stated that an appellant assailing counsel's assistance must provide more than mere speculation or equivocal inferences. *Duke v. State,* 2004 WY 120, ¶ 36, 99 P.3d 928, 943 (Wyo. 2004), cert. denied, 544 U.S. 1062, 125 S.Ct. 2513, 161 L.Ed.2d 1113 (2005).

*Magallanes v. State,* 2006 WY 119, ¶ 18, 142 P.3d 1147, 1152–53 (Wyo.2006).

[¶ 59] Wease's contention that his attorney was not effective turns almost exclusively on the admission of prior bad acts—the general category of evidence described in W.R.E. 404(b). This has been, and continues to be, one of the thorniest and most elusive rules of evidence that we face. It arises with regularity in this Court, and, no doubt, even more often in many trial courts. The general rule is, of course, that such evidence is not admissible, and for good reason:

§ 4:21. **Background and purpose.**

. . . .

Especially in criminal cases, what may be called the basic rule of exclusion is a rule of fundamental importance in American law. It implements the philosophy that a defendant should not be convicted because he is an unsavory person, nor because of past misdeeds, but only because of his guilt of the particular crime charged. In practical effect, the Rule limits use of prior crimes, calling for exclusions where the evidence tends only to show propensity. As the Supreme Court has stated emphatically, such evidence is excluded *not* because it is irrelevant, but because "practical experience" teaches that exclusion "tends to prevent confusion of issues, unfair surprise and undue prejudice."

1 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence,* § 4:21, at 691–92, and § 4:22, at 697–99(3rd ed.2007).

[¶ 60] We have examined defense counsel's performance in this case, especially with regard to the admission of evidence of Wease's many prior bad acts. As we concluded above, much of that evidence was not 404(b) evidence so much as it was a description of the grooming process used by many child molesters and the recitation of the "story" of each victim's life as it interacted with Wease's. Moreover, we have recognized a relaxed standard with respect to this sort of evidence in child molestation cases. In light of the standards we have established, we are unable to conclude that defense counsel was ineffective or that his overall performance was prejudicial to Wease's case.

**CONCLUSION**

[¶ 61] We hold that the sentence imposed as to Count V is in error. That sentence is vacated and the matter is remanded to the district court for imposition of a lawful sentence. We also hold that the evidence with respect to Count VII was insufficient to sustain the jury's verdict of guilt. The remand shall include the district court's dismissal of Count VII. We conclude that the district court did not commit reversible error in allowing the admission of prior bad acts evidence, and that defense counsel was not ineffective in advocating for his client with respect to that evidence. The remainder of the judgment and sentence is affirmed in all respects. However, we caution that the procedures followed in this case were at best marginal and we do not, by affirming the bulk of Wease's convictions, recommend that any procedures followed here be used in other similar cases, nor do we recommend the use of the sort of limiting instructions that the district court and the parties agreed to in this case. While defense counsel performed adequately in these circumstances, this case is principally one that should be used by defense attorneys as a method *not* to utilize in such a case.