2010 WY 45

**Randall D. SCHREIBVOGEL,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

**No. S–09–0044.**

Supreme Court of Wyoming.

April 16, 2010.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Kerin, Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

Representing Appellee: Bruce A. Salzburg, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Leda M. Pojman, Senior Assistant Attorney General. Argument by Ms. Pojman.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   Randall Schreibvogel was convicted of two counts of first degree sexual assault, in violation of Wyo. Stat. Ann. § 6–2–302,[1] and one count of robbery, in violation of Wyo. Stat. Ann. § 6–2–401 (LexisNexis 2007).[2]   He challenges his convictions on several grounds.   He contends that he was denied his right to a fair trial because of erroneous evidentiary rulings, prosecutorial misconduct, and ineffective assistance of defense counsel. We affirm.

### ISSUES

[¶ 2]   Mr. Schreibvogel presents six issues:

1.   Did the district court abuse its discretion in quashing the subpoena duces tecum at the request of the prosecutor?

2.   Did the trial court commit plain error when it allowed into evidence victim impact testimony?

3.   Did the cumulative effect of numerous instances of inadmissible hearsay deny Appellant his right to a fair trial?

4.   Did the district court err when it allowed in 404(b) evidence after the Appellant had made the proper demand for notice, and the State had failed to provide any notice?

5.   Did the prosecutor commit misconduct when he cross-examined the Appellant as to whether other witnesses were lying or mistaken;   and did he commit misconduct when he requested that the jury consider the number of witnesses who testified on behalf of D.C. and her character, compared to the lack of wit-

nesses that the defense presented on Appellant?

6.   Did trial counsel provide ineffective assistance of counsel, by his failure to object to inadmissible evidence, and failure to adequately advance his theory of the case?

The State phrases the issues as follows:

1.   Did the district court abuse its discretion when it granted the State's motion to quash the subpoena for the victim's financial records?

2.   Was the victim impact testimony and argument admitted during Appellant's trial relevant and was he prejudiced?

3.   Was the challenged testimony inadmissible hearsay which denied Appellant his right to a fair trial?

4.   Did the district court abuse its discretion when it allowed the admission of alleged uncharged misconduct testimony?

5.   Did prosecutorial misconduct occur and was Appellant prejudiced?

6.   Was trial counsel ineffective and was Appellant prejudiced?

### FACTS

[¶ 3]   D.C., the victim in this case, lived in Rawlins and owned a hair salon in Saratoga. On October 31, 2007, she attended a Halloween party in Saratoga.   The restaurant hosting the Halloween party was located next door to her salon.   D.C. planned to spend the night in Saratoga at her salon.

[¶ 4]   Mr. Schreibvogel was in the area on a fishing trip.   He also went to the party. D.C. had met Mr. Schreibvogel briefly at a restaurant during lunch that day and noticed him sitting next to her at the bar.   They talked intermittently during the party.   On several occasions, Mr. Schreibvogel suggest-

---

1.   Wyo. Stat. Ann. § 6–2–302(a)(i) & (iii) state:

(a) Any actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if:
(i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement;
. . .

(iii) The victim is physically helpless, and the actor knows or reasonably should know that the victim is physically helpless and that the victim has not consented.

2.   Wyo. Stat. Ann. § 6–2–401(a)(i) states:
(a) A person is guilty of robbery if in the course of committing a crime defined by W.S. 6–3–402 he:
(i) Inflicts bodily injury upon another.

ed that he and D.C. leave the party. He offered to help her clean the salon. She refused the offer each time.

[¶ 5] At some point during the party, D.C. left her drink at the bar and went to the dance floor. When she returned, she took a sip of the drink and soon felt "strange" and "groggy." She informed the bartender that something was wrong and left the party. When she arrived at her salon, D.C. testified that she remembered reaching down to retrieve a key she had placed in her shoe for safekeeping and then waking up on the ground outside of her salon. She testified that she could not remember if she fell or if she was struck. Several witnesses testified that D.C. told them a few days after the incident that she had been hit. An emergency room doctor testified that D.C. had facial injuries that were likely caused by a punch.

[¶ 6] When D.C. regained consciousness she discovered that she was bleeding. She remembered hearing something, but was not sure what it was. She then entered her salon and lost consciousness again. She regained consciousness twice before morning. When she awoke the first time, Mr. Schreibvogel was engaged in oral sex with her. On the second occasion, Mr. Schreibvogel was engaged in sexual intercourse with her. The next morning she awoke to discover that Mr. Schreibvogel had left, and that the money in her tip jar was missing. She reported the incident to the hospital, her husband, and law enforcement officials two days after it occurred.

[¶ 7] Mr. Schreibvogel's version of the events differed substantially. He maintained that D.C. invited him back to her salon. He testified that he witnessed her fall and hit her face on the ground. When she got up, he claimed that he asked her if she was okay and they entered the salon. Mr. Schreibvo-

gel conceded that he and D.C. had sexual relations, but claimed it was consensual. He maintained that he never saw money or a tip jar in the salon.

[¶ 8] A jury found Mr. Schreibvogel guilty of two counts of first degree sexual assault and one count of robbery. The district court imposed a prison sentence of fifteen to thirty years on each count of sexual assault and five to ten years on the robbery count. The sentences were ordered to be served concurrently. Mr. Schreibvogel filed a timely appeal.

## DISCUSSION

### Motion to Quash

[¶ 9] Prior to trial, Mr. Schreibvogel served a subpoena duces tecum on D.C.[3] The subpoena required pretrial production of D.C.'s personal financial and bank records, including tax returns, for the past five years. At D.C.'s request, the State moved to quash the subpoena. After a hearing, the district court granted the motion pursuant to W.R.Cr.P. 17(d) finding that compliance with the subpoena would be oppressive and burdensome to D.C.[4] Mr. Schreibvogel claims that the State did not have standing to bring the motion, and the district court abused its discretion in granting the motion.

[¶ 10] Whether standing exists is a legal issue. *Northfork Citizens for Responsible Development v. Park County Bd. of County Commissioners*, 2008 WY 88, ¶ 6, 189 P.3d 260, 262 (Wyo.2008). This Court reviews legal issues *de novo. Johnson v. State*, 2009 WY 104, ¶ 12, 214 P.3d 983, 986 (Wyo.2009); *Reiter v. State*, 2001 WY 116, ¶ 7, 36 P.3d 586, 589 (Wyo.2001). For a party to have standing, he "must demonstrate the manner in which his own rights are adversely affected in light of the circum-

---

3. Mr. Schreibvogel also served a subpoena duces tecum on D.C.'s business. She produced the documents requested in that subpoena.

4. W.R.Cr.P. 17(d) governs subpoenas duces tecum:

    A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compli-

ance would be unreasonable or oppressive. The court may direct that books, papers, documents or other objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents, objects, and portions thereof, to be inspected by the parties and their attorneys.

stances before the court." *Gooden v. State*, 711 P.2d 405, 408 (Wyo.1985), quoting *Armijo v. State*, 678 P.2d 864, 868 (Wyo.1984).

[¶ 11]   Mr. Schreibvogel asserts that the State did not have standing to challenge the subpoena duces tecum.  The State maintains that it had standing to challenge the subpoena because it had a legitimate interest in protecting its witness, the victim, from harassment and "preventing unfounded and potentially time-wasting incursions during trial into an irrelevant and superfluous side issue."  We agree with the State for reasons succinctly stated by the Connecticut Supreme Court:

We conclude that the state had standing to move to quash the defendant's subpoena. "A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests." *United States v. Raineri*, 670 F.2d 702, 712 (7th Cir. [1982] ), cert. denied, 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982).  It is inarguable that the state had a legitimate interest in challenging the subpoena duces tecum that had been issued to Smith [the defendant's supervisor].  The subpoena, which was served by the defendant on a key state witness during the pendency of the trial, sought numerous documents and materials.  "The prosecution's standing rested upon its interest in preventing undue lengthening of the trial [and] undue harassment of its witness . . . ." *Id.*

The defendant claims that the town of Westport has its own legal department and could have filed a motion to quash the subpoena on Smith's behalf.  This argument, however, misses the point: the interest that the state legitimately sought to protect in seeking to quash the subpoena belonged to the state, not the town.  Moreover, many state's witnesses are persons who cannot be expected to hire lawyers and incur the expense associated with challenging a subpoena issued by an accused. Thus, the trial court properly concluded that the state had standing to challenge the subpoena that the defendant served on Smith.

*State v. Decaro*, 252 Conn. 229, 745 A.2d 800, 816 (2000).  *See also Raineri*, 670 F.2d at 712; *United States v. Segal*, 276 F.Supp.2d 896, 900 (N.D.Ill.2003).

[¶ 12]   Mr. Schreibvogel also challenges the district court's ruling on the motion.  We review rulings on pretrial motions, such as a motion to quash, for an abuse of discretion.  *Wolfe v. State*, 998 P.2d 385, 387 (Wyo.2000).  This standard of review requires this Court to examine "the reasonableness of the trial court's choice," in ruling on the matter.  *Gould v. State*, 2006 WY 157, ¶ 8, 151 P.3d 261, 264 (Wyo.2006).

[¶ 13]   The district court "may quash or modify the subpoena if compliance would be unreasonable   or   oppressive."   W.R.Cr.P. 17(d).  The subpoena served upon D.C. requested that she produce "all financial records including tax return[s] for the past five (5) years and bank records for the past five (5) years in her possession or control." These items were to be produced pretrial. After a hearing, the district court granted the State's motion to quash stating:

The Court finds [Mr. Schreibvogel's] subpoena duces tecum unreasonable and oppressive.   [Mr. Schreibvogel's] subpoena requests records for a lengthy period of time and any time period outside of that immediately surrounding the date of the alleged criminal act is irrelevant to the issues in question.  Further, retrieving accurate financial records for such a time period overly burdens the alleged victim and the monetary cost would be incurred unnecessarily.

The record supports the findings of the district court and we are unable to find any abuse of discretion in quashing the subpoena.

[¶ 14]   In asserting that the district court abused its discretion in quashing the subpoena, Mr. Schreibvogel relies upon the decision of the United States Supreme Court in *United States v. Nixon*, 418 U.S. 683, 699, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974). His reliance is misplaced.  *Nixon* supports the decision reached by the district court.

[¶ 15]   In *Nixon*, the government pursued the prosecution of presidential campaign officials and former government officials for con-

spiracy to defraud the United States and to obstruct justice. In doing so, the special prosecutor issued a third-party subpoena duces tecum to the President seeking pretrial production of documents and recordings relating to conversations with advisors and aides.[5] The President filed a motion to quash the subpoena. The motion was denied and the President appealed. The United States Supreme Court granted certiorari and affirmed the trial court's denial of the motion to quash. The Supreme Court stated:

A subpoena for documents may be quashed if their production would be "unreasonable or oppressive," but not otherwise. The leading case in this Court interpreting this standard is *Bowman Dairy Co. v. United States*, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951). This case recognized certain fundamental characteristics of the subpoena duces tecum in criminal cases: (1) it was not intended to provide a means of discovery for criminal cases, *id.*, at 220, 71 S.Ct. [at 679]; (2) its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials, *ibid.* As both parties agree, cases decided in the wake of *Bowman* have generally followed Judge Weinfeld's formulation in *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y.1952), as to the required showing. Under this test, in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Nixon*, 418 U.S. at 698–700, 94 S.Ct. at 3103 (footnotes and emphasis omitted). The Court went on to state that, "[a]gainst this background" the party seeking enforcement of a subpoena, in order to carry his or her burden, had to clear the three hurdles of relevancy, admissibility, and specificity. *Id.* at 700, 94 S.Ct. at 3103.

[¶ 16]   In sum, the Court noted:

In a case such as this, however, where a subpoena is directed to a President of the United States, appellate review, in deference to a coordinate branch of Government, should be particularly meticulous to ensure that the standards of Rule 17(c) have been correctly applied. *United States v. Burr*, 25 F.Cas. pp. 30, 34 (No. 14,692d) (CC Va. 1807). From our examination of the materials submitted by the Special Prosecutor to the District Court in support of his motion for the subpoena, we are persuaded that the District Court's denial of the President's motion to quash the subpoena was consistent with Rule 17(c). We also conclude that the Special Prosecutor has made a sufficient showing to justify a subpoena for production before trial. The subpoenaed materials are not available from any other source, and their examination and processing should not await trial in the circumstances shown. *Bowman Dairy Co. v. United States*, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951); *United States v. Iozia*, 13 F.R.D. 335 (S.D.N.Y.1952).

*Id.* at 702, 94 S.Ct. at 3104–05 (emphasis omitted).

[¶ 17]   Mr. Schreibvogel made no attempt to comply with the requirements of the *Nixon* test. He argued generally that the information was relevant because it went directly to the credibility of the witness regarding the amount of money she claimed was in her tip jar at the time of the incident.[6] He made no

---

**5.** The subpoena duces tecum was issued pursuant to Fed.R.Crim.P. 17(c). W.R.Cr.P. 17(d) was based on the federal rule and contains the same relevant language.

**6.** Mr. Schreibvogel claims on appeal that if prior tax records showed that D.C. did not receive a certain amount in tips throughout the years, such information could have been used to impeach

her testimony about the value of the tips in the jar at the time of the incident. He also asserts that the bank statements and business records would either prove or disprove D.C.'s assertion that she would routinely allow smaller tips to stockpile and periodically exchange them at the bank for larger bills. These arguments were not presented to the district court during the hear-

effort to establish that his request was sufficiently specific. He did not explain why he had requested five years of documents or why it was necessary that D.C. provide him with all of her personal records. He failed to establish that the documents were not available from another source. It was undisputed that D.C. had previously provided the financial records of the hair salon business in response to another subpoena duces tecum. Mr. Schreibvogel did not contend that he could not properly prepare for trial without the requested personal financial documents. Additionally, the request for "all financial records" for a five year period, ostensibly to challenge testimony regarding the contents of the tip jar on a specific date, could easily be viewed as a fishing expedition.

[¶ 18] Mr. Schreibvogel maintains that the district court should have modified the subpoena instead of granting the State's motion to quash. W.R.Cr.P. 17(d) allows the court to modify a subpoena if compliance would be unreasonable or oppressive, but it does not require the court to do so. During the hearing, defense counsel suggested that the court evaluate the records in camera and decide whether the records were relevant. That procedure, however, would still have required D.C. to compile the records for the full five years. Mr. Schreibvogel, as the party requesting the information, had the burden to show that the requested documents were specific, relevant, and not intended as a general fishing expedition. *Nixon*, 418 U.S. at 699–700, 94 S.Ct. at 3103. He did not satisfy this burden. The district court did not abuse its discretion in granting the motion to quash.

### Victim Impact Testimony

[¶ 19] Mr. Schreibvogel next contends the district court erred by allowing evidence regarding the impact of the incident on D.C. He did not object to the introduction of this evidence at trial, and we review for plain error. Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party

claiming the error was denied a substantial right resulting in material prejudice. *Causey v. State*, 2009 WY 111, ¶ 18, 215 P.3d 287, 293 (Wyo.2009).

[¶ 20] Mr. Schreibvogel takes exception to testimony from D.C. and her husband concerning D.C.'s behavior after the incident. In response to questions by the State, D.C. testified:

[Prosecutor]: Have you—did you ever stay overnight in that shop again?

[D.C.]: No.

\* \* \* \*

Q. Okay. Did you change your hours?

A. Yes.

Q. Tell us about that.

A. I didn't work after dark.

\* \* \* \*

Q. When [your husband] leaves [town for work]—when he was leaving town prior to Halloween were you staying by yourself?

A. Yes.

Q. After Halloween 2007, did you continue to stay by yourself when your husband is gone?

A. No.

Q. Do you have a concealed weapons permit?

A. Arizona.

Q. Did you start carrying a firearm with you?

A. Yes.

Q. Tell us about your sleeping habits. Did they change after October 31, 2007?

A. Yes.

Q. Can you tell us how?

A. My sleep was violent to the point where my husband couldn't sleep with me some nights.

Q. Describe, if you can, what you mean by "violent."

A. He said I would punch and kick, and that's—

Q. How long did that—how long did it go on that your husband wasn't able to sleep with you?

ing. In determining whether there was an abuse of discretion, we must focus on the information before the district court at the time it made its decision.

A. It still is sometimes.

[¶ 21] D.C.'s husband testified as follows:

[Prosecutor]: After Halloween of 2007, have you observed any changes in your wife's behavior?

[D.C.'s Husband]: Well, her personality hasn't changed. She is still the way she is. She's friendly towards people. I'm sure some of the people already know about her personality. She is real bubbly. You know, but as for that, she doesn't—she watches her back a little more. She's a little more observant of where she is, where she's going. I told her not to stay at the shop anymore after dark.

Q. What about sleeping?

A. Excuse me?

Q. What about her sleep habits?

A. Her sleep habits changed. I didn't like getting hit in bed all the time. She was having pretty bad dreams, and I ended up going on the couch myself because I had to have a little bit better sleep than get woke up half the night. And she told me that was just having bad sleep with a few nightmares here and there.

\* \* \* \*

Q. What effect were the nightmares that she was having on you?

A. Well, I was getting woke up. I asked her what was the matter. She said somebody is chasing me or got a hold of me or whatever. And all that I can say is, well, you're okay. You're at home. And then she would go back to sleep, and I would go back to sleep.

Q. Was she waking you up as a result of these nightmares?

A. Yes, she was.

Q. Was she hitting you?

A. Yeah.

Q. Was she kicking you? Was she saying anything?

A. I'm not exactly sure a lot of the words, because some of it was mumbled, but I would hear "no" and "I got to get away" I heard a couple of times. The exact verbiage, no, I couldn't tell you every one. Those were pretty distinct that I remember.

Q. Do you work out of town? . . .

A. At that time or now?

Q. Now.

A. Yeah. I'm about 30 miles from where we live.

Q. Do you stay overnight when you're out of town?

A. No, not for work. Recently I have been out of town. I was in North Dakota and Montana for almost a month, and I can travel sometimes.

Q. Does your wife stay home alone when you're out of town anymore?

A. No, not really. I ask friends to stay over—usually friends that I have known for like a—like a brother, so to speak. There's a couple of gentlemen that they either stay there at the house, or they come in and look in on her.

Because the testimony is clearly revealed in the record, the parties do not dispute that the first part of the plain error test is satisfied. The parties differ on whether a clear and unequivocal rule of law was violated.

[¶ 22] Victim impact testimony is evidence that relates "to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family." *Smith v. State*, 2005 WY 113, ¶ 15, 119 P.3d 411, 416 (Wyo.2005); *Olsen v. State*, 2003 WY 46, ¶ 151, 67 P.3d 536, 592 (Wyo.2003). Victim impact testimony may or may not be admissible. *Thomas v. State*, 2009 WY 92, ¶ 7, 211 P.3d 509, 511–12 (Wyo.2009). "The key inquiry on the admissibility of victim impact testimony during the guilt phase of a criminal trial is relevancy." *White v. State*, 2003 WY 163, ¶ 13, 80 P.3d 642, 649 (Wyo.2003); *Justice v. State*, 775 P.2d 1002, 1011 (Wyo.1989); *McCone v. State*, 866 P.2d 740, 751 (Wyo. 1993). "Such testimony may be irrelevant if offered . . . as proof of the victim's loss; the physical, emotional, or psychological impact on the victim; or the effect upon the family. Yet it may be relevant if offered for other purposes." *White*, ¶ 13, 80 P.3d at 649. In criminal cases, evidence is relevant when it tends to prove or disprove an element of the charged crime. *Id.; Grabill v. State*, 621 P.2d 802, 809 (Wyo.1980); *see Lancaster v.*

*State,* 2002 WY 45, ¶ 42, 43 P.3d 80, 97 (Wyo.2002).

[¶ 23] Before trial, Mr. Schreibvogel made it clear that his defense to the sexual assault charges was that the encounter was consensual. Such a defense strategy naturally entailed an attack on D.C.'s credibility. Defense counsel immediately called D.C.'s credibility into question during opening statements when he posited his theory that D.C. had consensual sexual relations with Mr. Schreibvogel and then fabricated the assault to protect herself and her marriage.

[¶ 24] The State concedes that the challenged testimony of D.C. and her husband is victim impact testimony. It contends, however, that the testimony was relevant to counter the attack on D.C.'s credibility. Specifically, the State maintains that evidence of changes to D.C.'s work habits, sleeping patterns, and other behaviors was relevant to prove she had undergone a traumatic experience. We have previously recognized that it was not error, plain or otherwise, to utilize claimed victim impact testimony to bolster the credibility of a witness after an attack upon that witness' credibility. *Barnes v. State,* 858 P.2d 522, 534–35 (Wyo.1993). The same rule applies here. D.C.'s credibility was at issue. The challenged testimony bolsters her credibility and, under the circumstances of this case, we cannot find that there was a violation of a clear and unequivocal rule of law. Mr. Schreibvogel has not established plain error.

### Hearsay Testimony

[¶ 25] Mr. Schreibvogel next asserts error arising from the testimony of three witnesses who testified regarding statements made to them by D.C. shortly after the incident. He contends that the challenged testimony was "inadmissible hearsay" and that the cumulative effect of the testimony deprived him of a fair trial. We disagree.

[¶ 26] Mr. Schreibvogel did not object to the challenged testimony at trial. Accordingly, we review for plain error. Mr. Schreibvogel has failed to establish a violation of a clear and unequivocal rule of law.

He has not established that the challenged testimony was hearsay or that the testimony did not fall within one of the numerous exceptions to the hearsay rule. He also has not established that he was materially prejudiced by the testimony. An error is prejudicial when a reasonable possibility exists that, absent the error, the appellant may have enjoyed a more favorable outcome. *Foster v. State,* 2010 WY 8, ¶ 15, 224 P.3d 1, 7 (Wyo. 2010).

[¶ 27] The asserted error arises from the testimony of the investigating officer, an x-ray technician, and an emergency room nurse. Each recounted D.C.'s statements to them about the incident. All of the statements were made within two days of the incident. For the most part, the statements were consistent with D.C.'s trial testimony. There were some differences. From Mr. Schreibvogel's perspective, the most significant difference related to whether D.C. was struck as she entered her salon. At trial, D.C. testified that she could not recall if she had been hit. The investigating officer and the x-ray technician both testified that D.C. told them that she had been hit.

[¶ 28] Because there was no objection at trial, it is difficult to identify the specific basis for admissibility of the challenged testimony. For example, the testimony of the investigating officer is not hearsay, if not offered for the truth of the matter asserted. W.R.E. 801(c). If the testimony was elicited in an effort to provide context for the officer's investigation, rather than for the truth of the matter asserted, it is admissible for a limited purpose. *Olson v. State,* 698 P.2d 107, 114 (Wyo.1985). In such a situation, a limiting instruction would be appropriate if requested by the defendant. Mr. Schreibvogel did not make such a request.

[¶ 29] The testimony of the emergency room nurse regarding D.C.'s version of the incident may fall within one of the exceptions to the hearsay rule. An exception to the hearsay rule allows statements made for purposes of medical diagnosis or treatment. W.R.E. 803(4). To the extent that D.C.'s prior statements were consistent with her trial testimony, they are potentially admissi-

ble under W.R.E. 801(d)(1)(B) which provides:

> (d) *Statements which are not hearsay.*—A statement is not hearsay if:
>
>> (1) Prior Statement by Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

[¶ 30] In short, because the challenged evidence was potentially admissible under several evidentiary rules, Mr. Schreibvogel has failed to establish a violation of a clear and unequivocal rule of law. "Under the plain error standard of review, we reverse a trial court's decision only if it is so plainly erroneous that the judge should have noticed and corrected the mistake even though the parties failed to raise the issue.... [T]he Appellant must demonstrate the existence of a clear and unequivocal rule of law which the particular facts transgress in a clear and obvious, not merely arguable, way." *Causey,* ¶ 19, 215 P.3d at 293 (internal quotation marks omitted).

[¶ 31] Mr. Schreibvogel has also failed to establish that he was materially prejudiced by the admission of the challenged evidence. Testimony from several other witnesses established the use of physical force. The hospital manager of emergency services testified that D.C. said "she was struck from behind." The emergency room doctor, when asked if he had an opinion about what caused D.C.'s injuries said, it "look[ed] like somebody who was probably right-handed punched her in

the eye." Mr. Schreibvogel's "pod-mate," who had shared a room with him in jail, testified that Mr. Schreibvogel had said "[I] should have hit the bitch in the mouth again." There was no reasonable possibility that the outcome of the trial would have been any different had the challenged testimony not been admitted.

### *404(b) Evidence*

[¶ 32] Mr. Schreibvogel contends that the district court erred when it allowed testimony that he was "coked up" during the fishing trip and that he was behind on his child support payments. He contends that the evidence is "404(b) evidence" and that the district court abused its discretion in admitting the evidence.[7] The State disputes the characterization of the evidence as "404(b) evidence." It contends that it did not intend to introduce evidence that Mr. Schreibvogel was "coked up" during his fishing trip and that it had no obligation to provide notice. The State asserts that the evidence relating to the child support arrearages was not 404(b) evidence. It also contends that, if 404(b) applies, the evidence was properly admissible to establish a motive for the robbery.

[¶ 33] We note at the outset that application of an abuse of discretion standard is difficult, if not impossible, in a situation where the issue is not brought to the attention of the district court for an evidentiary ruling. Mr. Schreibvogel did not object to the admission of the evidence at trial and the district court had no opportunity to make a determination as to whether the evidence was 404(b) evidence and, if so, whether it was admissible for a proper purpose under that rule. We recognize that we have previously

---

**7.** At the time of Mr. Schreibvogel's trial, W.R.E. 404(b) provided:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Effective January 1, 2009, W.R.E. 404(b) now provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a

person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

held that a pretrial demand for notice of the State's intent to use 404(b) evidence satisfies the objection requirement. *Simmons v. State*, 2003 WY 84, ¶ 20, 72 P.3d 803, 810 (Wyo.2003). However, it is not always clear whether the State intended to introduce the evidence or whether the evidence is "404(b) evidence." We would strongly urge defense counsel to raise an objection at trial to any evidence that may run afoul of W.R.E. 404(b).

[¶ 34] The evidence that Mr. Schreibvogel was "coked up" during his fishing trip was introduced during the testimony of his former pod-mate. Mr. Schreibvogel claims that the State should have given notice of its intent to use the evidence and that it was inadmissible under Rule 404(b). The thrust of the testimony was that Mr. Schreibvogel had confessed to committing the sexual assault and robbery to the pod-mate while they were in jail together:

[Prosecutor]: As close as you can, can you tell the ladies and gentlemen of the jury what he told you.

[Witness]: Yeah. He said that him and a friend were here on a fishing trip in Saratoga, and they were all coked up and Mr.—

Q. Let's stop there. What do you mean by "coked up?" Does that have a meaning to you?

A. Cocaine, drugs.

Q. Okay. What else did he tell you?

A. That he went to a bar on Halloween night and that he was looking for a lady to take back to the motel, and she was the only one left. I don't remember the gal's name. But she had to go back and clean her hair salon place that she had owned, and he followed her there, and then he told me—well, he was showing me the rape kit papers that he had. And he kind of laughed and said that he should have hit the bitch in the mouth again.

Q. You remember him saying that?

A. Yes, sir. And that he made her suck his penis and that he had sex with her and it was the worst sex—or the worst 15–minute–piece–of–ass that he's had, and then he took an undisclosed amount of money from her, but it was enough to pay for his trip.

* * * *

Q. Did he talk about the amount of money that he took from this woman?

A. No, sir, he didn't. He just said it was a lot.

Q. He said what?

A. It was a lot of money, and it paid for his trip and the motel room that they had rented.

[¶ 35] It does not appear from the record that the State, prior to trial, intended to utilize the evidence of Mr. Schreibvogel's drug use. The pod-mate was not asked to testify regarding Mr. Schreibvogel's drug use. He was merely asked to tell the jury what he had been told by Mr. Schreibvogel. If the prosecution did not intend to introduce such evidence, it was not required to provide the defense with notice. *Reay v. State*, 2008 WY 13, ¶ 19, 176 P.3d 647, 653 (Wyo.2008).

[¶ 36] Even if the statements were admitted in error, Mr. Schreibvogel fails to establish that he was materially prejudiced by the challenged testimony. *See Britton v. State*, 2009 WY 91, ¶ 15, 211 P.3d 514, 517 (Wyo. 2009). The statements relating to drug use were cumulative of other evidence presented to the jury. In opening statements, defense counsel told the jury about Mr. Schreibvogel's past cocaine use when he said: "Now, I'm not going to hide the bag from you. [Mr. Schreibvogel] has a conviction for drug possession. He's a convicted felon, but I tell you that because you need to know all of the pieces of the puzzle." Mr. Schreibvogel testified during direct and cross-examination about his previous conviction for cocaine possession. He also testified on redirect examination that he did not possess cocaine during the fishing trip and that he never told anyone that he did. We are unable to find a reasonable possibility that the trial would have been any different had the pod-mate's very limited testimony regarding Mr. Schreibvogel's use of cocaine not occurred.

[¶ 37] The evidence of child support arrearages was not introduced during the State's case-in-chief. The challenged testi-

mony occurred during the State's cross-examination of Mr. Schreibvogel:

[Prosecutor]: Do you have any children?

[Mr. Schreibvogel]: Yes, I do.

Q. And do you pay child support?

A. Yes.

Q. And you are in arrearages on that, aren't you?

A. Yes, I am.

Q. And you're in arrearage in the amount of $12,000; is that correct?

A. It is in court right now.

Q. It is in the amount of about $12,000; isn't it?

A. Yes.

[¶ 38]  Mr. Schreibvogel boldly asserts that the evidence relating to child support arrearages is 404(b) evidence. We question that assertion. "[A]n appellant cannot demonstrate error by simply branding any evidence 404(b) evidence." *Cazier v. State*, 2006 WY 153, ¶ 31, 148 P.3d 23, 34 (Wyo.2006). W.R.E. 404(b) prohibits evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show that he acted in *conformity therewith*." (Emphasis added.) Evidence that Mr. Schreibvogel was behind in his child support payments is not the kind of evidence that would naturally lead the jury to believe that he would also commit a sexual assault and a robbery. If the evidence was 404(b) evidence, it is properly admissible to establish motive for the robbery. *Belden v. State*, 2003 WY 89, ¶ 31, 73 P.3d 1041, 1085 (Wyo. 2003). We find no abuse of discretion in admitting the evidence for that purpose.

### Prosecutorial Misconduct

[¶ 39]  Mr. Schreibvogel also contends that prosecutorial misconduct deprived him of a fair trial. Allegations of prosecutorial misconduct are settled by reference to the entire record and "hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial." *Mazurek v. State*, 10 P.3d 531, 542 (Wyo. 2000), *see also Lafond v. State*, 2004 WY 51, ¶ 15, 89 P.3d 324, 329 (Wyo.2004). Mr. Schreibvogel did not object to the statements he now claims were error. Thus, we review

his claim for plain error. *Talley v. State*, 2007 WY 37, ¶ 9, 153 P.3d 256, 260 (Wyo. 2007).

[¶ 40]  Mr. Schreibvogel contends that the prosecutor used an improper questioning technique during his cross-examination:

[Prosecutor]: Did you hear the testimony of [the bartender] who heard you ask a number of times the victim in this case to go back to the [shop] to help her clean. Did you hear her testimony?

[Mr. Schreibvogel]: Yeah, I heard the testimony.

Q. And that was her shop that she was going to, right, to clean up the shop? You heard that testimony?

A. Yes.

Q. And you asked that over and over again? Did you hear that testimony?

A. I heard that testimony, yes.

Q. And every time you asked that, the answer came back no. Did you hear that?

A. I heard her testimony. I never asked that.

Q. You never asked that?

A. No, I didn't.

Q. So when [the bartender] said that she was sitting really close to you and heard that on a number of occasions, that would be an incorrect statement by that bartender?

A. Yes. I never—I never asked over and over.

Q. You never did that?

A. No, I didn't.

Q. *So the bartender would be mistaken then, correct?*

A. *I guess. I guess.*

Q. And you heard the victim's testimony, didn't you?

A. Yes, I did.

Q. Ten times you asked to go back, and each time you were refused until the end when you just—she just ignored you. Did you hear that testimony?

A. I heard the testimony.

Q. *Was that testimony incorrect as well?*

A. *Yes, to my knowledge, yes.*

* * * *

Q. And so when [your former pod-mate] indicated that you financed your fishing trip with that money, tell us about that. *Is that also an incorrect statement?*

A. *I never once mentioned how I financed our fishing trip, never.*

(Emphasis added.)

[¶ 41] "Although a defendant who testifies in a criminal case may be cross-examined regarding his credibility just like any other witness, there are limits placed upon the prosecutor." *Talley*, ¶ 10, 153 P.3d at 260. A witness may not comment on the truthfulness or veracity of another witness. *Huff v. State*, 992 P.2d 1071, 1079 (Wyo. 1999). It is the jury's duty to resolve factual issues, judge the credibility of the witnesses, and determine the guilt or innocence of a criminal defendant. *Gayler v. State*, 957 P.2d 855, 860 (Wyo.1998). It is error and misconduct for a prosecutor to ask a witness whether he thinks other witnesses are "lying" or "mistaken." *Proffit v. State*, 2008 WY 114, ¶ 15, 193 P.3d 228, 235 (Wyo.2008), citing *Beaugureau v. State*, 2002 WY 160, ¶ 17, 56 P.3d 626, 635–36 (Wyo.2002).

[¶ 42] The State concedes that the questions by the prosecutor violated a clear and unequivocal rule of law. It asserts, however, that Mr. Schreibvogel cannot establish that the misconduct resulted in unfair prejudice. To determine whether unfair prejudice from prosecutorial misconduct has occurred this Court balances several factors: "1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct." *Talley*, ¶ 16, 153 P.3d at 262. When we apply these factors to the challenged testimony, we are unable to find unfair prejudice.

[¶ 43] Although Mr. Schreibvogel testified and his credibility was at issue, we cannot say that he "invited the misconduct." However, the misconduct here was not severe or pervasive. The questioning, while improper, was brief and the prosecution did not draw attention to Mr. Schreibvogel's answers during closing argument. The questions centered, not on the main issue of consent, but on the number of times Mr. Schreibvogel asked D.C. to go back to the salon and how he financed the fishing trip. Mr. Schreibvogel did not request a cautionary instruction or other curative measure. In closing argument, the prosecution reiterated that it was up to the jury to determine the credibility of the witnesses. After reviewing the entire record, we cannot conclude that had the prosecutor not employed the "were-they-lying" technique, a reasonable possibility exists that the verdict would have been more favorable to Mr. Schreibvogel.

[¶ 44] Mr. Schreibvogel also asserts that statements by the prosecutor during closing argument resulted in an unfair trial. In review, this Court considers the prosecutor's argument in its entirety, not just the sentences and phrases taken out of context. *Wheeler v. State*, 691 P.2d 599, 605 (Wyo.1984). Failure to interject a timely objection to an improper argument is treated as a waiver, unless the misconduct is so flagrant as to constitute plain error and require reversal. *Jeschke v. State*, 642 P.2d 1298, 1301 (Wyo.1982). "Plain error in closing argument must remain hard to find because otherwise the trial court becomes charged with an adversary responsibility to control argument even when objection is not taken by the opposing attorney." *Dice v. State*, 825 P.2d 379, 385 (Wyo.1992).

[¶ 45] Mr. Schreibvogel asserts that the prosecutor impermissibly shifted the burden of proof to the defense in the following statements:

[Prosecutor]: The tough situation in judging the demeanor of the defendant is the situation in which he was asked about his constant repetition: I want to go back to the salon with you to help you clean it up. Now, the testimony presented by the State—we have heard this occurred on at least ten occasions. That is the victim's testimony. And the bartender indicated it happened so many times that she could recount it, even though it was a busy night, and each time it was no.

But when the defendant was confronted with this situation, how many times did you ask [the victim] to go back with you to help her clean, he didn't say he didn't remember. He said it did not happen. He said it did not happen because that would not clear with his story that he had indicated to you that the advances that night were not made by him, not by the gentleman that he is, but by the victim in this case.

But there is no corroboration of that whatsoever. There is not one independent witness that corroborates the testimony of the defendant. Certainly that's a situation for your determination. It's not only the credibility. It is a matter of corroboration of the statement, and it just was not there.

The statement of the victim, taken in its entirety, indicates that [D.C.] had been raped brutally that day; she had been robbed. And those statements are corroborated by other credible evidence. The statements by the defendant are mixed with contradictions, outright lies, and certainly indicate a circumstance in which the defendant is doing everything to—because he has an interest in this case. He has an interest in this case to walk away and to walk away a free man, and you're instructed that you can't consider that in determining his testimony.

And look at the corroboration by the bartenders, by people that knew the victim in this case, which indicates the type of person that the victim is in this case. And these were people that came forward to talk about the person that the victim is. It would be nice at a funeral if you would have that many people who would come up and say that you are that type of individual: That you're kind, professional and a person that will always help out.

*There is no legion of people that came up to talk about the defendant in this case, that corroborated what he said, corroborated the statements he made. The statements stand alone uncorroborated.*

(Emphasis added.)

[¶ 46] "A fundamental principle of our system of criminal justice is that the burden of proof rests upon the State and never shifts." *Leiker v. State*, 994 P.2d 917, 919 (Wyo.1999). However, we have also recognized that "[i]t is not improper for the government to draw attention to the failure or lack of evidence on a point, if it is not intended to call attention to the failure of the defendant to testify." *Id.* Viewed in context, the prosecutor's statements referenced the lack of corroboration of Mr. Schreibvogel's version of the events. We cannot conclude that this brief reference to the lack of corroborating evidence amounted to a shift in the burden of proof. The prosecutor's statements did not violate a clear and unequivocal rule of law and we are unable to find plain error.

### Ineffective Assistance of Counsel

[¶ 47] In his last issue, Mr. Schreibvogel contends that he received ineffective assistance of counsel. We review such claims de novo. *Dettloff v. State*, 2007 WY 29, ¶ 17, 152 P.3d 376, 382 (Wyo.2007). This Court invokes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment. *Eustice v. State*, 11 P.3d 897, 902 (Wyo.2000). "[T]he paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance." *Sorensen v. State*, 6 P.3d 657, 660 (Wyo.2000). In order to prevail with his ineffective assistance of counsel claim, Mr. Schreibvogel must first show that his counsel's performance was deficient. This requires a showing of errors so serious that Mr. Schreibvogel was essentially denied his Sixth Amendment right to counsel. *See Eustice*, 11 P.3d at 901–02, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Second, he must show that the deficient performance of counsel prejudiced his defense. *Eustice*, 11 P.3d at 901.

[¶ 48] In support of his claim, Mr. Schreibvogel contends that there were numerous instances when inadmissible evidence was presented to the jury without objection. He does not specifically identify the objectionable evidence. Presumably, he refers to the claimed evidentiary errors discussed pre-

viously. Trial counsel is given wide latitude to make tactical decisions. This includes not objecting upon the belief that such action might draw undue attention to damaging evidence. *Chapman v. State*, 2001 WY 25, ¶ 22, 18 P.3d 1164, 1174 (Wyo.2001); *Dice*, 825 P.2d at 384; *Rigler v. State*, 941 P.2d 734, 738 (Wyo.1997). Mr. Schreibvogel has failed to establish that any objection would have been sustained or that failure to object was not a reasonable tactical decision.

[¶ 49] Mr. Schreibvogel also claims that his trial counsel did not adequately cross-examine D.C. Specifically, he contends that D.C. should have been questioned regarding whether "she was assisted or asked if she was okay when she fell outside her shop." He contends that cross-examination might have elicited a response that would have been supportive of his defense contention that the sexual relations were consensual. His assertion is purely speculative and we will not consider it further.

[¶ 50] Mr. Schreibvogel cannot show that his defense was prejudiced by his trial counsel's performance. He has not shown that he was materially prejudiced by any of the alleged evidentiary errors. There is no reasonable possibility that, had trial counsel objected to the challenged evidence or questioned the victim about what she heard that night, the outcome of the trial would have been more favorable to Mr. Schreibvogel.

[¶ 51] Affirmed.

VOIGT, C.J., files a specially concurring opinion.

VOIGT, Chief Justice, specially concurring.

[¶ 52] I concur in the result reached by the majority because *stare decisis* requires us to place upon the appellant the impossible task of proving prejudice in cases such as this. The majority states the well-established law in Wyoming: "It is error and misconduct for a prosecutor to ask a witness whether he thinks other witnesses are 'lying' or 'mistaken.'" *See Proffit v. State*, 2008 WY 114, ¶ 15, 193 P.3d 228, 235 (Wyo.2008); *Teniente v. State*, 2007 WY 165, ¶ 51, 169 P.3d 512, 528–29 (Wyo.2007); *Talley v. State*, 2007 WY 37, ¶¶ 10–11, 153 P.3d 256, 260

(Wyo.2007); *Jensen v. State*, 2005 WY 85, ¶ 20, 116 P.3d 1088, 1096 (Wyo.2005); and *Beaugureau v. State*, 2002 WY 160, ¶ 17, 56 P.3d 626, 635–36 (Wyo.2002). Yet the prosecutor in this case asked the appellant not once, but three times, whether another witness—the bartender, the victim, and the cellmate—was incorrect or mistaken. Perhaps the State would pay attention to the law if it bore the burden of proof as to the lack of prejudice.

[¶ 53] Another point. This was a sexual assault/robbery case. I would think it would be fairly clear that the appellant allegedly being "coked up" was uncharged misconduct evidence, banned by W.R.E. 404(b) except under particularized circumstances. The majority is correct that the appellant's failure to object to the "coked up" testimony at the time it was elicited makes it difficult to apply an abuse of discretion standard of review. But the appellant did make a pretrial demand for notice of such evidence, meeting the requirement we have set, and there simply is no innocent explanation for the manner in which the State introduced the evidence. The State cannot claim surprise as to the answer when it asks one of its own witnesses, "[a]s close as you can, can you tell the ladies and gentlemen of the jury what he told you." At best, that shows lack of preparation. Maybe, had the prosecutor then left the subject alone and gone on with something else, it would be excusable. But that question was followed up with these—"Let's stop there. What do you mean by 'coked up?' Does that have meaning to you?" And the answer— "Cocaine, drugs." The prosecutor intentionally introduced evidence of the appellant's drug use without subjecting that evidence to the judicial review that we have mandated. *See Bromley v. State*, 2009 WY 133, 219 P.3d 110 (Wyo.2009); *Wease v. State*, 2007 WY 176, 170 P.3d 94 (Wyo.2007); *Williams v. State*, 2004 WY 117, 99 P.3d 432 (Wyo.2004); *Moore v. State*, 2003 WY 153, 80 P.3d 191 (Wyo.2003); *Gleason v. State*, 2002 WY 161, 57 P.3d 332 (Wyo.2002); and *Howard v. State*, 2002 WY 40, 42 P.3d 483 (Wyo.2002).

[¶ 54] My concern is that, while the harmless error rule certainly makes sense as

a reasonable systemic tool, its actual application via a process that requires each appellant to prove that he or she has been prejudiced by prosecutorial misconduct, leaves the State nearly unfettered in its ability to do as it pleases, this Court's opinions to the contrary notwithstanding.